## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | Civil Action No. 19-12165 |
| THE STATE OF MICHIGAN, | ) | |
| *Ex. Rel.* MICHAEL ANGELO | ) | Hon. Arthur J. Turnow |
| | ) | Magistrate Steven Whalen |
| Plaintiffs, | ) | |
| | ) | **FILED *IN CAMERA* AND** |
| vs. | ) | **UNDER SEAL** |
| | ) | |
| STATE FARM MUTUAL AUTOMOBILE | ) | **FALSE CLAIMS ACT** |
| INSURANCE COMPANY, | ) | **MEDICAID FRAUD** |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMAND** |

## PLAINTIFFS' COMPLAINT PURSUANT TO 31 U.S.C. 3729-3733

**NOW COMES**, Relator, MICHAEL ANGELO ("Relator"), by and through

his attorneys, AKEEL & VALENTINE, PLC, and brings this action filed by

Relator pursuant to the Qui Tam provisions of the False Claims Act to recover

treble damages and civil penalties against Defendant.

## INTRODUCTION

1.     Qui Tam Relator Michael Angelo brings this action on behalf of the

United States of America and the State of Michigan to recover civil damages,

estimated in the hundreds of millions of dollars, and penalties under the False

Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Michigan Medicaid False Claim

Act, MCL 400.601, *et seq.*, against Defendant, State Farm Mutual Automobile Insurance Company ("State Farm").

2.     Relator's allegations against Defendant relates to an illegal scheme by which Defendant exploited and circumvented the Medicare Secondary Payer Act, and Michigan auto insurance law – the No Fault Act – to avoid paying medical benefits to motor vehicle accident victims it insured, thus, causing the government to pick up the expenses without being reimbursed by Defendant.

3.     In other words, Defendant has engaged in an elaborate and sophisticated fraudulent scheme that has caused the government to sustain significant financial loss by paying out sums of money that should have been paid by Defendant pertaining to motor vehicle injured victims.

4.     Under this illegal scheme, Defendant also knowingly presented, or caused to be presented, false or fraudulent information which causes payment or approval from the United States and/or the State of Michigan.

## PARTIES

5.     Relator, Michael Angelo (hereinafter "Relator"), is a citizen of the United States of America and a resident of the State of New Jersey, County of Union.  Relator has a Certificate in Marketing and at all relevant times herein owned and operated 1-800-US-Lawyer, US Health Pharmaceuticals, LLC D/B/A Meds Direct Pharmacy, and Tox Testing, Inc D/B/A Paragon Diagnostics.

6.      Defendant, State Farm, is an Illinois corporation.  It is engaged in the business of insurance, and regularly sells automobile insurance within the State of Michigan.  Defendant State Farm is one of the largest insurance providers in the United States and one of the largest that is publicly held.  It was ranked No. 36 in the 2018 Fortune 500 list of the largest United States corporations by total revenue. In fact, Defendant State Farm's annual revenue exceeds $81.7 billion.  ("State Farm Insurance COS Profile." Fortune 500, fortune.com/fortune500/state-farm-insurance-cos/.).

7.      Defendant is licensed by Michigan's Department of Insurance and Financial Services to write auto insurance policies in the State of Michigan.

8.      Defendant has permanent, continuous, and regular contacts with the State of Michigan.

9.      Relator is suing on his own behalf, and on behalf of, and in the name of, the United States of America, pursuant to 31 U.S.C. § 3730(b), and the State of Michigan, pursuant to the *qui tam* provision of Michigan's Medicaid False Claim, MCL 400.610a(2).

10.      Relator brings this action on behalf of the United States of America and the State of Michigan against Defendant to recover treble damages and civil penalties under the False Claims Act ("FCA").  Relator alleges that Defendant knowingly and improperly avoid or decrease an obligation to pay or transmit

money or property to the United States and the State of Michigan. Relator also alleges that Defendant knowingly present, or cause to be presented, false or fraudulent information which causes payment or approval from the United States and the State of Michigan.

11.     Relator has complied with the notice provisions of the Federal FCA, 31 U.S.C. §3730(b)(2) and the Michigan Medicaid False Claim Act, MCL 400.610a(2) by providing the Attorney General of the United States, Attorney General for the United States' Eastern District of Michigan, and the Michigan Attorney General, Health Care Fraud Division, simultaneous with the filing of this complaint, with a statement of material evidence and information related to this complaint, which support the existence of the false claims by Defendant. (**Exh. A**).

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction in this matter under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345.

13.     This Court may retain Relator's state claim, the Michigan Medicaid False Claim Act ("MMFCA"), pursuant to its discretion to exercise pendant jurisdiction over that claim. Pendant jurisdiction is proper in this case because Relator's federal FCA claim evokes federal question jurisdiction, and the MMFCA claim derives from a common nucleus of operative facts, and their violations arise

4

from the same transactions, occurrences, and scheme. Further, the nature of the FCA and MMFCA claims are such that judicial economy would be achieved and Relator would expect that they be tried in one proceeding.

14. The Court has personal jurisdiction over Defendant by and through Defendant's permanent, continuous, and regular contacts with the State of Michigan.

15. Venue is proper in the United States District Court of the Eastern District of Michigan, Southern Division, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Michigan's jurisdiction and is where Plaintiff resides.

16. Relator has direct and independent knowledge within the meaning and definition of 31 U.S.C. § 3730(e)(4)(B) derived through and from Relator's relationship with Defendant at one or more of his facilities, of the information on which the allegations set forth in this Complaint are based. Furthermore, Relator is a person qualifying as the original source of information pursuant to MCL § 400.610a(13).

17. None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions in a criminal, civil, or administrative hearing; nor in any congressional, administrative or General

Accounting Office or Auditor General's report, hearing, audit investigation or from the news media.

## APPLICABLE FACTS AND LAW

**Background on the Opioid Crisis**

18.    The United States government has made addressing the opioid epidemic a top priority, which has been exacting a toll on individuals, families, and communities across the country.

19.    The Department of Health and Human Services ("HHS") has made the crisis a top clinical priority and has committed to using its resources to combat the epidemic.

20.    Over the past two decades, communities across the United States have been devastated by increasing prescription and illicit opioid abuse, addiction, and overdose.

21.    According to the Substance Abuse and Mental Health Services Administration's, ("SAMSHA"), National Survey on Drug Use and Health ("NSDUH"), in 2016, over 11 million Americans misused prescription opioids, nearly 1 million used heroin, and 2.1 million had an opioid use disorder due to prescription opioids or heroin.

22.    Over the past decade, the United States has experienced significant increases in rates of neonatal abstinence syndrome ("NAS"), hepatitis C infections, and opioid-related emergency department visits and hospitalizations.

23.    Since 2013, there has been a rapid increase in overdose deaths involving illicitly made fentanyl and other highly potent synthetic opioids.

24.    In 2017, more than 70,200 Americans died from drug overdoses, including illicit drugs and prescription opioids – the highest number ever recorded in the United States.

25.    According to HHS, the opioid epidemic in the United epidemic in the United States is fundamentally tied to two primary issues.

26.    The first issue was the significant rise in opioid analgesic prescriptions that began in the mid-to-late 1990s.

27.    Not only did the volume of opioids prescribed increase, but well-intentioned healthcare providers began to prescribe opioids to treat pain in ways that we now know are high-risk and have been associated with opioid abuse, addiction, and overdose, such as prescribing at high doses and for longer durations.

28.    The second issue is a lack of health system and healthcare provider capacity to identify and engage individuals, and provide them with high-quality, evidence-based opioid addiction treatment.

29.   It is well-documented that the majority of people with opioid addiction in the United States do not receive treatment, and even among those who do, many do not receive evidence-based care.

30.   According to HHS, accounting for these factors is paramount to the development of a successful strategy to combat the opioid crisis.

31.   In April 2017, HHS outlined its five-point Opioid Strategy, which provides the overarching framework to leverage the expertise and resources of HHS agencies in a strategic and coordinated manner.

32.   One of the five strategies is to advance the practice of pain management to enable access to high-quality, evidence-based pain care that reduces the burden of pain for individuals, families, and society while also reducing the inappropriate use of opioids and opioid-related harms.

33.   To aid in achieving these goals, the Federal Drug Administration ("FDA") has sought to reduce exposure to prescription opioid drugs.

34.   The FDA has cracked down on clinics and clinicians who are inappropriately prescribing patients opioids, or those who do not properly maintain records, or document history, of patient use of opioids.

35.   Clinics and clinicians across the nation have begun instituting more rigorous testing to prevent prescriptions of opioids to those at-risk of misuse, ensure proper compliance with federal and state laws, and protect their practices

8

from civil and criminal proceedings due to lack of evidence for individual patients' prescriptions.

36.     This includes more regular urine analyses to test and predict the likelihood of patients' misuse of opioids.

**Background on Federal and State-Funded Health Insurance Programs**

37.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program.

38.     Medicare provides health insurance to people age 65 or older, people under 65 with certain disabilities, and people of all ages with end-stage renal disease.

39.     Payments from the Medicare Program come from a trust fund – known as the Medicare Trust Fund – which is funded through payroll deductions taken from the work force, in addition to government contributions.

40.     The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

41.     Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

42.     Under Medicare Part A, contractors serve as "fiscal intermediaries," administering Medicare in accordance with rules developed by the Health Care Financing Administration, now known as the CMS.

43.     Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas.  These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

44.     The principal function of both intermediaries and carriers is to make and audit payments for Medicare services to assure that federal funds are spent properly.

45.     To participate in Medicare, providers must assure that their services are provided economically and are medically necessary.  Medicare will reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

46.     Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act.

47.     Medicaid aids the states in furnishing medical assistance to eligible, needy persons, including indigent and disabled persons.

48.     Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

49.     Medicaid is a cooperative federal-state public assistance program that is administered by the states.

50.     Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program.

51.     Title XIX of the Social Security Act allows considerable flexibility within each State's Medicaid plan and, therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

52.     However, in order to receive federal matching funds, a state Medicaid program must meet certain minimum coverage and eligibility standards.

**Michigan Auto Insurance Law – the No Fault Act**

53.     In 1973, Michigan's No-Fault law, MCL 500.3101 *et seq*., went into effect.

54.     Under the No-Fault Act, "[t]he owner or registrant of a motor vehicle required to be registered in this state shall maintain security for payment of benefits under personal protection insurance, property protection insurance, and residual liability insurance."  MCL 500.3101(1).

55.     In other words, every owner of a car must buy certain basic coverages in order to get license plates.

56.     It has been against the law to drive or let your car be driven without No-Fault insurance.

57.     The purpose of the No-Fault Act is to broadly provide coverage for those injured in motor vehicle accidents without regard to fault. *Iqbal v. Bristol W. Ins. Grp.*, 278 Mich. App. 31, 37 (2008).

58.     The goal of the No-Fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses. *Shavers v. Kelley*, 402 Mich. 554, 579 (1978).

59.     The Legislature believed this goal could be most effectively achieved through a system of compulsory insurance, whereby every Michigan motorist would be required to purchase No-Fault insurance or be unable to operate a motor vehicle legally in Michigan. *Id*.

60.     Under this Act, victims of motor vehicle accidents would receive insurance benefits for their injuries as a substitute for their common-law remedy in tort. *Id*.

61.     In the event of an auto accident, No-Fault insurance pays for the medical expenses, wage loss benefits, and replacement services for those involved in the accident.

62.     Basic No-Fault policies are required to have personal injury protection ("PIP"), property protection ("PPI"), and residual liability insurance – essentially bodily injury and property damage.

63.     Payments for collision damage, medical treatment, and wage loss are administered by one's own insurance carrier, such as State Farm.

64.     PIP benefits pay for all reasonably necessary medical expenses with no maximum limit as a result of a motor vehicle accident.

65.     Disputes over who is at fault are irrelevant when making a claim for benefits.   In exchange for this uncomplicated access to No-Fault benefits, the injured party can sue only in the case of serious injury, disfigurement, or death.

**Michigan Auto Insurance Law – PIP Benefits – Order of Priority**

66.     A person injured while she is an occupant of a motor vehicle should first make a claim for Michigan No-Fault benefits with the insurance company where she is listed as a named insured on the policy.

67.     If the person injured in an auto accident is not named on a motor vehicle insurance policy, she may claim No-Fault benefits from the insurance company of a spouse or a relative who lives in the same household.

68.     If the injured person does not have a No-Fault insurance policy of her own, and does not have a spouse or resident relative who has insured an automobile, she may still recover No-Fault benefits from the insurance company of

either the owner or registrant of the vehicle the victim occupied at the time of her accident.

69.    If the owner and registrant of an automobile are both uninsured, the injured individual can still collect Michigan No-Fault benefits from the insurance company of the operator of the automobile the victim occupied at the time of the accident.

70.    If none of these individuals are insured, the injured person can still recover Michigan No-Fault benefits.  The injured person must file a claim with the Michigan Assigned Claims.

71.    To summarize, the order of priority for No-Fault insurance is: 1) No-Fault insurer of injured occupant; 2) No-Fault insurer of injured occupant's spouse; 3) No-Fault insurer of resident relative of injured occupant; 4) No-Fault insurer of owner or registrant of the vehicle occupied at the time of the accident; 5) No-Fault insurer of the operator of the vehicle occupied at the time of the accident; and 6) Michigan Assigned Claims.

72.    Additionally, as later discussed, if none of the above-listed priorities provide prompt payment for auto-related injuries, an injured person may then resort to Medicare or Medicaid, if that person qualifies, as a secondary payer to pay for expenses incurred for the treatment, as further described below.

**Medicare Secondary Payer Act (42 U.S.C. §1395y,** *et seq.***)**

73.     In certain cases, an individual who is eligible for Medicare coverage also has coverage through an auto insurance policy providing No-Fault medical benefits.

74.     Congress endeavored to coordinate payment in situations in which an individual has overlapping Medicare benefits and private insurance coverage by enacting the Medicare Secondary Payer ("MSP") statute in 1980.  42 U.S.C. § 1395y, *et seq.*

75.     The MSP statute and related regulations dictate when Medicare will pay a medical claim as the "primary payer" and when Medicare will pay as a "secondary payer."  Generally, under the MSP statute and related regulations, the private insurance carrier, such as State Farm, is always the primary payer.  *See e.g.*, 42 U.S.C. § 1395y(b)(2)(A), (B); 42 C.F.R. § 411.172.

76.     The CMS has provided guidelines on when Medicare will pay medical benefits when No-Fault auto insurance coverage is also available.

77.     Medicare is liable for claims stemming from a motor vehicle accident *only* when the No-Fault insurance coverage, such as PIP, has been exhausted.

78.     The CMS has promulgated the following guideline: "Under § 1862(b)(2) of the Act, 42 U.S.C. 1395y(b)(1), Medicare does not make payment for covered items or services to the extent that payment has been made, or can be

reasonably be expected to be made under no-fault insurance. Medicare is *secondary* to no-fault insurance even if State law or a private contract of insurance stipulates that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries…" *Medicare Secondary Payer (MSP) Manual*, Chapter 2 – MSP Provisions, Section 60 – No-Fault Insurance (Rev. 49, Issue: April 07, 2006; Effective/Implementation: May 08, 2006).

79.    In other words, the MSP prohibits CMS from making payments for Medicare-covered services if payment has been made, or can reasonably be expected to be made, by another payer. 42 U.S.C. § 1395y(b)(2)(A)(ii); 42 C.F.R. § 411.20.

80.    When Medicare is the proper payer (i.e., when the No-Fault insurer or other primary payer does not make a payment), Medicare will make payments for items and services that are reasonable and necessary for the diagnosis and/or treatment of an injury. 42 U.S.C. § 1395y(a).

81.    The MSP also allows CMS to make "conditional payments" to the beneficiary if there is a delay in reimbursement from another entity for a covered service. 42 U.S.C. § 1395y(b)(2)(B); 42 C.F.R. §§ 411.21 and 411.24.

82.    Medicare will make a conditional payment to a beneficiary if there is a delay in payment by the primary payer (i.e. No-Fault insurer) to keep the

beneficiary from experiencing a gap in coverage.  42 U.S.C. § 1395y(b)(2)(B); 42

C.F.R. §§ 411.21 and 411.24.

83.    These conditional payments must be reimbursed to Medicare within

60 days of receipt of payment.

84.    If a primary payer, such as an insurer for No-Fault coverage, or

provider fails to pay back the conditional payments, CMS may assess double

damages.

85.    This is because the insurer, being the primary payer, has the duty to

pay for all expenses that are reasonable and necessary for the treatment and care of

its injured insured or the beneficiary for Medicare payments before Medicare is to

make any payment.  *Advocacy Org. for Patients & Providers v. Auto Club Ins.*

*Ass'n*, 257 Mich. App. 365, 376, 670 N.W.2d 569, 576 (2003), aff'd, 472 Mich.

91, 693 N.W.2d 358 (2005) ("As noted, § 3107 is a liability provision providing

that no-fault insurers are only liable for medical expenses that are (1) reasonable,

(2) reasonably necessary, and (3) incurred.") (citation omitted).

86.    Subsequently, Medicare may pursue reimbursement of conditional

payments from a primary payer if a conditional payment was made pursuant to No-

Fault insurance or workers' compensation plans, among other things.

87.    Medicare oftentimes only receives reimbursements for conditional

payments from insurers if the victim of a motor vehicle accident has a claim for

No-Fault or liability insurance and gets a money judgment or settlement from their insurance company, such as Defendant.

88.     However, according to MSP, repayment *is* required by an insurer for any payments made by Medicare, if it is demonstrated that such insurer had the responsibility to make such payment for a particular item or service paid for by Medicare. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii).

89.     In other words, if a lawsuit is never filed [which many insureds do not file for several reasons, including: a) not being advised of their rights; b) the amounts involved, such as pharmacy bills[1], do not justify an attorney's time to pursue – up to $5,000 or more; or c) the insured is simply averse to litigation, among other reasons], oftentimes, the government is not reimbursed for conditional payments made to an insured victim.

90.     The MSP also requires that No-Fault auto insurance companies – such as Defendant – report certain beneficiary information to CMS.

91.     In fact, No-Fault insurance companies (or "insurers") have a duty to report ongoing responsibilities for medical bills ("ORM") for certain beneficiaries (or "insureds"), whether the insurer a) determined to assume such responsibility, or b) *was required* to assume such responsibility.  **Exh. B** – MSP Policy Guideline, Ch. 3, p. 6-10.

---

[1] Such low amounts, however, when added up for all injured insureds, can result in millions of unpaid pharmacy bills.

18

92.    It is imperative that No-Fault insurers also report the cause and nature of the illness or accident associated with the claim to allow Medicare to determine what specific medical service claims – if submitted to Medicare – should be first paid by the insurer, and which medical services should be considered for secondary payment, only, by Medicare.  **Exh. B** – MSP Policy Guideline, Ch. 3, p. 6-11.

93.    Additionally, when an ORM is terminated, the insurer should report the date of the termination.

94.    The ORM termination date should not be submitted unless one of the following occurs: 1) a signed statement by the beneficiary's (insured) physician indicating no more treatment is needed; 2) the insurer's responsibility for ORM has been terminated under applicable state law associated with the insurance contract; or 3) where the insurer's responsibility for ORM has been terminated pursuant to the terms of the contract.  **Exh. B** – MSP Policy Guideline, Ch. 3, p. 6-12.

95.    Non-compliance with these reporting requirements results in a minimum fine of $1,000 a day per unreported beneficiary and, potentially, double damages.

96.    The intent behind these reporting requirements is that if a Medicare beneficiary is injured and another payer (such as a No-Fault insurance or workers' compensation plan) is responsible for paying for the medical treatment of the beneficiary, then the other party should be the primary party.

97. Those No-Fault insurers who register with Medicare, such as State Farm, must register at least a quarter before submitting reports.

98. Additionally, registered No-Fault insurers are required to submit two primary reports: 1) ongoing responsibility for medical bills, or ORM as discussed above, and 2) what is known as total payment obligation to the claimant ("TPOC" or "TPOC Report").

99. ORM reports do not include dollar amounts, but just the fact that payments are being made for ongoing medical expenses, and the start and end dates.

100. Additionally, as stated, an ORM report should include information about the cause of illness, injury, or incident associated with the claim so that Medicare can determine who the responsible payer is.

101. TPOC reports are made when the sum of a total settlement, judgment, award, or other payment obligation is established.

102. There are various mandatory reporting thresholds depending on the type of insurance and date of payment. CMS: MMSEA Section 111 MSP Mandatory Reporting: NGHP User Guide Ch. III (v5.3 2017). Available at http://go.cms.gov/2zIX58k.

103. Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("MMSEA") added these mandatory reporting requirements, which include

ORM and TPOC reports, and which is now codified as part of 42 U.S.C. § 1305, *et seq*.

104. These insurers are obligated to notify Medicare about "settlements, judgments, awards, or other payment from…No-Fault insurers…" received by or on behalf of Medicare beneficiaries.

105. Insurers are also always responsible for understanding when there is coverage primary to Medicare, and for notifying Medicare to ensure Medicare is reimbursed appropriately. **Exh. C** – MSP Policy Guideline, Ch. 1, p. 4-1.

106. The reporting requirements for insurers, such as Defendant, under the MMSEA Section 111 first became effective on May 1, 2009.

107. The purpose of Section 111 reporting is to enable CMS to pay appropriately for Medicare-covered items and services furnished to Medicare beneficiaries.

108. Section 111 reporting No-Fault insurance information helps CMS determine when other insurance coverage is primary to Medicare, meaning that it should pay for the items and services first before Medicare considers its payment responsibilities.

109. Reporting is accomplished by either the submission of an electronic file of No-Fault claim information, where the injured party is a Medicare

beneficiary, or by the entry of this claim information directly into a secure Web portal, depending on the volume of data to be submitted.

110. Upon receipt of this information, CMS checks whether the injured party associated with the claim report is a Medicare beneficiary, and determines if the other insurance is primary to Medicare.

111. CMS then uses this information in the Medicare claims payment process and, if Medicare paid first when it should not have, uses it to seek repayment from the other insurer or the Medicare beneficiary.

112. Congress also enacted a parallel MSP provision that applies to state Medicaid plans. 42 U.S.C. § 1396a(25)(A)(ii); 42 C.F.R. §§ 433.135-140.

**Medicaid Secondary Payer Act**

113. Just like Medicare, Medicaid is generally considered the payer of last resort. 42 C.F.R. §433.135, *et seq.*

114. Section 433 of Title 42 regulates State fiscal activities with respect to state-ran Medicaid programs. 42 C.R.F. § 433.1.

115. Subpart D ("Third Party Liability") concerns the liability of third parties, such as commercial insurance companies, with respect to claims submitted to a Medicaid program for payment. 42 C.F.R. § 433.135, *et seq.*

116.   Similar to the MSP statute, federal regulation ensures that Medicaid is secondary to other available sources of insurance benefits, including No-Fault auto insurance benefits like PIP.  42 C.F.R. § 433.139.

## FALSE CLAIMS ACTS

117.   The Federal False Claims Act, 31 U.S.C. § 3729, provides, in pertinent part:

(a) Liability for certain acts. –

a. **In general.**— Subject to paragraph (2), any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); …

(G) *knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410[2]), plus 3 times the

---

[2] So in original.  Probably should read "Public Law 101-410".

amount of damages which the Government sustains because of the act of that person.

118.    The United States Supreme Court has held that the FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the government and reaches beyond "claims" that might be legally enforced, to all fraudulent attempts to cause the government to pay out sums of money and, therefore, the term "false or fraudulent claim" should be construed broadly.  *United States v. Neifert-White Co.*, 390 U.S. 228, 232-33 (1968).

119.    The MMFCA, MCL 400.603, provides, in pertinent part:

(A) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits.

(B) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit.

**Relator's Facilities**

120.    Relator incorporates by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

121.    At all relevant times herein, Relator owned and operated US Health Pharmaceuticals, LLC D/B/A Meds Direct Pharmacy, and Tox Testing, Inc D/B/A Paragon Diagnostics (herein collectively referred to as "Relator's Facilities").

122. US Health Pharmaceuticals, LLC D/B/A Meds Direct Pharmacy ("Meds Direct") is a pharmacy located on 16100 19 Mile Road, Clinton Township, MI 48038.

123. Meds Direct opened on or around April 2015.

124. Since then, Meds Direct has served people with prescriptions for medications, including victims of motor vehicle accidents.

125. Meds Direct accepts certain private insurances, as well as Medicaid and Medicare, among others, to fulfill patients' prescriptions.

126. Under the laws of the State of Michigan and the United States, certain drugs require a medical laboratory report in order to fill its prescriptions.

127. The spirit of these laws is to ensure patients are properly using their medication and/or prevent an individual from filling out a prescription that they are not using.

128. In an effort to comply with the law, better monitor their patients, protect their practice, and provide a convenient location for patients to get a medical laboratory report, Relator founded Tox Testing, Inc.

129. Tox Testing D/B/A Paragon Diagnostics ("Paragon") is a clinical medical laboratory located on 16100 19 Mile Road, Clinton Township, MI 48038.

130. Paragon opened on or around April 2016.

131.   Since then, Paragon has provided a medical laboratory for patients, including victims of motor vehicle accidents, to submit a urine sample to be analyzed in a medical laboratory.

132.   Paragon accepts certain private insurances, as well as Medicaid and Medicare, among others, to fulfill patients' medical laboratory reports.

**Billing for Services**

133.   Relator's Facilities treat and/or provide medical services to individuals involved in motor vehicle accidents.

134.   Many of these patients come into contact with Relator's Facilities through Relator's marketing company, 1-800-US-Lawyer.

135.   1-800-US-Lawyer – which responds to various inquiries relating to premise liability, workplace injuries, dog bites, wrongful death, medical malpractice, and car accidents – connects the patient to a licensed attorney to review their claim, aid in receiving their entitled No-Fault benefits, and/or represent them in litigation.

136.   1-800-US-Lawyer was established around 1981 in the New York/New Jersey/Connecticut market and expanded to Michigan around 10 years ago.

137.   This has given Relator personal knowledge of Defendant' fraudulent schemes to pass off its No-Fault payment obligations to the federal government, and without reimbursing the government for payments made, as delineated below.

26

138.    The crux of this scheme includes that Defendant knowingly and improperly decrease an obligation to pay or transmit money or property to the United States' and Michigan Governments by, among other things: 1) intentionally delaying and/or failing to honor their obligations – under an insurance contract – to their injured insureds to pay No-Fault benefits, including but not limited to medical expenses (i.e., pharmacy bills, lab reports, etc.), on a timely basis, following a car accident, resulting in their insureds resorting to their back-up option of submitting their claims to Medicaid/Medicare to receive payment on those incurred medical expenses, which Defendant should have paid as the primary payer; 2) failing to properly report its insureds (those on Medicare/Medicaid) claims to Medicaid/Medicare, as required; and 3) failing to timely (if at all) reimburse the government for "conditional" payments made, causing the government to incur financial loss.[3]

139.    To explain the process further, in the event of a car accident in which a person has health insurance through Medicaid/Medicare and No-Fault insurance through Defendant, an insured would seek medical treatment at hospitals, doctor's

---

[3] As alleged, Medicare will make a conditional payment to a beneficiary if there is a delay in payment by the primary payer to keep the beneficiary from experiencing a gap in coverage.  42 U.S.C. § 1395y(b)(2)(B); 42 C.F.R. §§ 411.21 and 411.24. These conditional payments must be reimbursed to Medicare within 60 days of receipt of payment.  42 U.S.C. § 1395y(b)(2)(B)(ii).

clinics, physical and occupational therapy clinics, chiropractors, pharmacies, medical laboratories, and/or other licensed medical professionals.

140.   Following the accident, the insured would then file a claim with their respective insurer, Defendant State Farm.

141.   Defendant would oftentimes implement unwarranted delay tactics, and eventually delay and/or deny the claim, leaving Medicaid/Medicare to pay for medical expenses incurred.

142.   For background and historical purposes only, and which is public information, State Farm became notoriously known for a contract it had with a company known as McKinsey & Company ("McKinsey") which allegedly developed a program to help Defendant save money by delaying and terminating benefits to their insureds early.

143.   This included, but is not limited to, training Defendant's adjusters to allegedly: 1) gather as many facts as possible during the initial contact directly from the insured and before an attorney can be obtained; 2) place claims "under investigation"; and 3) retain attorneys to aggressively contest claims submitted by insureds.

144.   Ultimately, Defendant would allegedly then delay, not pay, and/or just arbitrarily deny coverage for the insured's injuries, leading some to file lawsuits

and settle for a reduced amount due to the undue hardship they endure during the pendency of their claims for benefits.

145.   This strategy became known as the "delay, deny, defend" strategy.

146.   What was not known publicly in the past, and has yet to be exposed publically before this instant action and a related action recently filed under seal against Allstate, Esurance, and Encompass Insurance Companies (Eastern District of Michigan, Case Number 19-11615), was the extent of the impact these delays and denials may have had on Medicare and Medicaid.

147.   Currently, however, Relator has personal knowledge of various insureds that are Medicare/Medicaid beneficiaries who have been arbitrarily denied coverage by Defendant, causing the federal government to sustain financial loss by paying monies to those insureds.

148.   In other words, Defendant's insured who was involved in the motor vehicle accident and who has no private health insurance is left to use its Medicaid/Medicare in order to pay for the medical services rendered.

149.   This may include, but is not limited to, bills for hospital treatments, physical and/or occupational therapy, prescription drug fills, medical laboratory testing, and chiropractic treatments, among other things.

150.   Medicaid/Medicare foots the bills for these costs and is not reimbursed by Defendant.

151.   Defendant is able to circumvent its obligation and responsibility to pay these bills and instead knowingly and improperly avoid or decrease an obligation to pay money to the United States and the State of Michigan, by: 1) denying legitimate claims under their policies/contracts with their insureds and causing Medicaid/Medicare to cover the costs of their medical expenses, 2) failing to report properly the denied claims[4], and/or then 3) failing to properly reimburse the federal government for Medicaid/Medicare payments made.

152.   Defendant also knowingly causes their insured to submit claims for payment or approval to the government, as a result of Defendant's arbitrary denial of coverage for claims it actually has a contractual duty to cover under the insured's policies/contracts.

153.   In other words, Defendant's insured's who are involved in accidents or car crashes but are arbitrarily and illegally denied and/or prevented from obtaining coverage by Defendant are then compelled to use their Medicaid/Medicare to fill prescriptions, submit urine analyses, and/or otherwise receive reasonable and necessary medical services from Relator's Facilities.

---

[4] This may include: 1) omitting names of denied claims on the Ongoing Responsibility Medicals ("ORM") for those victims of car crashes that should be on the list, as they are covered by an insurance contract with Defendant; or 2) are on the ORM list but Defendant has refused to actually discharge its responsibility to pay for the medicals, as represented to the government.

154.    These treatments and/or services are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member", as delineated in 42 U.S.C. § 1395y, and are paid for by Medicaid/Medicare, despite Defendant's obligations to pay them.

155.    Through personal knowledge, Relator can present evidence of Defendant's failures to timely pay pursuant to its duties under the law or under its contract/policy with its insured.

156.    For example, for Relator's Tox Testing Inc/Paragon Diagnostics facility, State Farm has either delayed or denied payment pertaining to auto-related claims totaling $5.9 million since around 2016.    **Exh. D** – Unpaid Bills Spreadsheet.    This leaves those on Medicare/Medicaid to seek "conditional" payment from the federal government.

157.    Likewise, for Relator's US Health Pharmaceuticals, LLC/Meds Direct Pharmacy, State Farm has either delayed or denied payment pertaining to auto related claims totaling at least $3.3 million since around 2015. **Exh. D** – Unpaid Bills Spreadsheet.  This leaves those on Medicare/Medicaid to seek "conditional" payment from the federal government.

158.    However, Defendant's actions described above and below are not limited to denials of patients at Relator's Facilities, but rather are a practice instituted at healthcare facilities, including, but not limited to, hospitals, clinics,

pharmacies, and medical laboratories across the State of Michigan and the United States of America.

**Patient LC**

159.   On or around May 22, 2018, Relator's Facilities' patient, LC, was slowing to a stop for a red light when another vehicle rear-ended her.  The other driver then fled the scene before being caught by police.  Patient LC had No-Fault insurance through Defendant State Farm.  **Exh. E** – LC Crash Report.

160.   Patient LC filed a claim with her insurer, Defendant State Farm.

161.   Patient LC also began seeking treatment and/or medical services from Relator's Facilities.

162.   On or around October 2, 2018, Defendant State Farm placed Patient LC's request for benefits "under investigation".

163.   On or around October 19, 2018, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient LC's accident.  Defendant State Farm's EOB further stated "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…"

164.   On or around February 12, 2019, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient LC's accident.  Defendant State Farm's EOB further stated "The product,

service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…"

165.   On or around February 15, 2019, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient LC's accident.  Defendant State Farm's EOB further stated "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…"

166.   Patient LC had sought treatment from Relator's Facilities, among others, related to injuries sustained in her motor vehicle accident.

167.   All or some of Patient LC's bills related to her motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligation to pay them.

**Patient QD**

168.   On or around June 1, 2018, Relator's Facilities patient, QD, was involved in an accident when another vehicle rear-ended his, leading the other driver to receive a citation for failing to stop.  **Exh. F** – QD Crash Report.

169.   Patient QD filed a claim with his insurer, Defendant State Farm.

170.   Patient QD also began seeking treatment and/or medical services from Relator's Facilities.

171.   On or around June 19, 2018, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient QD's accident.  Defendant State Farm's EOB further stated, "This policy carries coordinated medical benefits coverage, which is in excess of any health insurance coverage.  Please forward these charges to the health insurer(s) and resubmit the bill with the EOB or voucher showing what the health insurer(s) allowed and paid."

172.   On or around June 26, 2018, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient QD's accident.  Defendant State Farm's EOB further stated, "This policy carries coordinated medical benefits coverage, which is in excess of any health insurance coverage.  Please forward these charges to the health insurer(s) and resubmit the bill with the EOB or voucher showing what the health insurer(s) allowed and paid."

173.   On or around July 24, 2018, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient QD's accident.  Defendant State Farm's EOB further stated, "This policy carries coordinated medical benefits coverage, which is in excess of any health insurance coverage.  Please forward these charges to the health insurer(s) and resubmit the

bill with the EOB or voucher showing what the health insurer(s) allowed and paid."

174.  On or around September 11, 2018, Defendant State Farm placed Patient QD's request for benefits "under investigation."

175.  On or around December 11, 2018, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient QD's accident.  Defendant State Farm's EOB further stated, "The injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle…" and "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…"

176.  On or around December 12, 2018, after receiving a request for reimbursement for treatment following Patient QD's accident, State Farm arbitrarily issued a partial payment for billed charges allegedly because "This is the Average Wholesale Price (AWP) for generic drugs contained in the Medi-Span pricing database"; "The injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle…"; and "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery, or rehabilitation…"  For this EOB, Patient QD was

seeking reimbursement of $6,540.34 for his total submitted charges, but was only paid $262.87.

177.   On or around December 13, 2018, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient QD's accident.   Defendant State Farm's EOB further stated, " "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…"

178.   On or around March 7, 2019, after receiving a request for reimbursement for treatment following Patient QD's accident, State Farm arbitrarily issued a partial payment for billed charges because it allegedly used the "FH Charge Benchmark Database."   For this EOB, Patient QD was seeking reimbursement of $465.79 for his total submitted charges, but was only paid $70.77.

179.   Patient QD had sought treatment from Relator's Facilities, among others, related to injuries sustained in his motor vehicle accident.

180.   All or some of Patient QD's bills related to his motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligation to pay them.

**Patient JFP**

181.  On or around July 7, 2017, Relator's Facilities' patient, JFP, was involved in an accident when another vehicle rear-ended hers at a traffic light. **Exh. G** – JFP Crash Report.

182.  Patient JFP filed a claim with her insurer, Defendant State Farm.

183.  Patient JFP also began seeking treatment and/or medical services from Relator's Facilities.

184.  On or around June 26, 2018, Defendant State Farm placed Patient JFP's request for benefits "under investigation."

185.  Patient JFP had sought treatment from Relator's Facilities, among others, related to injuries sustained in her motor vehicle accident.

186.  All or some of Patient JFP's bills related to her motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligation to pay them.

**Patient RYH**

187.  On or around March 28, 2018, Relator's Facilities' patient, RYH, was involved in an accident when another vehicle rear-ended his at a traffic light.[5] Patient RYH had No-Fault insurance through Defendant State Farm.  **Exh. H** – RYH Crash Report.

---

[5] The other driver disputes this narration of events.

188.   Patient RYH filed a claim with his insurer, Defendant State Farm.

189.   Patient RYH also began seeking treatment and/or medical services from Relator's Facilities.

190.   On or around April 4, 2019, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient RYH's accident.   Defendant State Farm's EOB further stated, "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…"  Defendant State Farm's EOB further claimed that "The injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle…"

191.   Patient RYH had sought treatment from Relator's Facilities, among others, related to injuries sustained in his motor vehicle accident.

192.   All or some of Patient RYH's bills related to his motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligation to pay them.

**Patient RVH**

193.   On or around November 16, 2018, Relator's Facilities' patient, RVH, was involved in a motor vehicle accident when another vehicle struck him on the passenger side at an intersection.   Patient RVH had No-Fault insurance through Defendant State Farm.  **Exh. I** – RVH Crash Report.

38

194.   Patient RVH filed a claim with his insurer, Defendant State Farm.

195.   Patient RVH also began seeking treatment and/or medical services from Relator's Facilities.

196.   On or around February 8, 2019, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient RYH's accident.  Defendant State Farm's EOB further stated that "The injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle…"

197.   Patient RVH had sought treatment from Relator's Facilities, among others, related to injuries sustained in his motor vehicle accident.

198.   All or some of Patient RVH's bills related to his motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligation to pay them.

**Patient SH**

199.   On or around June 21, 2018, Relator's Facilities' patient, SH, was involved in a motor vehicle accident at an intersection when another vehicle "failed to stop at stop sign" and struck Patient SH's vehicle.  Patient SH had No-Fault insurance through Defendant State Farm.  **Exh. J** – SH Crash Report.

200.   Patient SH filed a claim with his insurer, Defendant State Farm.

201.   Patient RVH also began seeking treatment and/or medical services from Relator's Facilities.

202.   On or around October 9, 2018, Defendant State Farm placed Patient SH's request for benefits "under investigation."

203.   On or around April 1, 2019, Defendant State Farm still had not made payments on bills received from Patient SH's medical providers.  Defendant State Farm also stated, "There will be a delay in payment of your bill.  Our investigation is ongoing.  Your bills will be considered for payment when our investigation is complete."

204.   Patient SH had sought treatment from Relator's Facilities, among others, related to injuries sustained in his motor vehicle accident.

205.   All or some of Patient SH's bills related to his motor vehicle accident were covered by United Healthcare, Medicare, and/or Medicaid, despite State Farm's obligation to pay them.

**Patient RI**

206.   On or around August 11, 2016, Relator's Facilities' patient, RI, was the passenger in a vehicle when the driver "swerved to avoid an object in the road and ran off roadway hitting the guard rail."  Patient RI had No-Fault insurance through Defendant State Farm.  **Exh. K** – RI Crash Report.

207. Pursuant to the order of priority for No-Fault insurance carriers, Defendant State Farm was the top priority for Patient RI's motor vehicle accident.

208. Patient RI filed a claim with his insurer, Defendant State Farm.

209. Patient RI also began seeking treatment and/or medical services from Relator's Facilities.

210. On or around March 15, 2018, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient RI's accident. Defendant State Farm's EOB further stated, "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…" Defendant State Farm's EOB further claimed that "The injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle…"

211. On or around April 13, 2018, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient RI's accident. Defendant State Farm's EOB further stated, "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…" Defendant State Farm's EOB further claimed that "The injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle…"

212.   Patient RI had sought treatment from Relator's Facilities, Ameritox, ACCU, and Western Slope Laboratory, among others, related to injuries sustained in his motor vehicle accident.

213.   All or some of Patient RI's bills related to his motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligations to pay them.

**Patient NSJ**

214.   On or around December 8, 2016, Relator's Facilities' patient, NSJ, was involved in an accident when her vehicle went off the roadway and collided into a fence.  Patient NSJ had No-Fault insurance through Defendant State Farm. **Exh. L** – NSJ Crash Report.

215.   Patient NSJ filed a claim with her insurer, Defendant State Farm.

216.   Patient NSJ also began seeking treatment and/or medical services from Relator's Facilities.

217.   On or around April 24, 2018, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient RI's accident.  Defendant State Farm's EOB further stated, "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…"  Defendant State Farm's EOB further claimed that

"The injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle…"

218.   On or around June 11, 2018, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient RI's accident.  Defendant State Farm's EOB further stated, "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…"  Defendant State Farm's EOB further claimed that "The injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle…"

219.   Patient NSJ had sought treatment from Relator's Facilities, among others, related to injuries sustained in her motor vehicle accident.

220.   All or some of Patient NSJ's bills related to her motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligations to pay them.

**Patient BJM**

221.   On or around February 24, 2018, Relator's Facilities' patient, BJM, was involved in a motor vehicle accident when her vehicle "was struck by [another vehicle] who was traveling north bound…at a high rate of speed", and t-boned Patient BJM's vehicle.  The other vehicle then fled the scene.  Patient BJM had No-Fault insurance through Defendant State Farm.  **Exh. M** – BJM Crash Report.

222.   Patient BJM filed a claim with her insurer, Defendant State Farm.

223.   Patient BJM also began seeking treatment and/or medical services from Relator's Facilities.

224.   On or around February 27, 2019, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient RI's accident.  Defendant State Farm's EOB further stated, "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…"  Defendant State Farm's EOB further claimed that "The injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle…"

225.   Patient BJM had sought treatment from Relator's Facilities, among others, related to injuries sustained in her motor vehicle accident.

226.   All or some of Patient BJM's bills related to her motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligations to pay them.

**Patient MAS**

227.   On or around March 13, 2018, Relator's Facilities' patient, MAS, was involved in a motor vehicle accident when she "passed out while in motion" and crashed into a light pole.  Patient MAS had No-Fault insurance through Defendant State Farm.  **Exh. N** – MAS Crash Report.

44

228. Patient MAS filed a claim with her insurer, Defendant State Farm.

229. Patient MAS also began seeking treatment and/or medical services from Relator's Facilities.

230. On or around June 21, 2018, Defendant State Farm placed Patient MAS's request for benefits "under investigation."

231. Upon information and belief, Defendant State Farm never formally denied Patient MAS's coverage, although Defendant has not submitted payment for any of its contractually-obligated duties.

232. Patient MAS had sought treatment from Relator's Facilities, among others, related to injuries sustained in her motor vehicle accident.

233. All or some of Patient MAS's bills related to her motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligations to pay them.

**Patient RS**

234. On or around February 22, 2018, Relator's Facilities' patient, RS, was a pedestrian crossing 8 Mile Road when a motor vehicle accident caused one of the vehicles to strike him on the crosswalk. **Exh. O** – RS Crash Report.

235. Pursuant to the order of priority for No-Fault insurance carriers, Defendant State Farm was the top priority for Patient RS's motor vehicle accident.

236. Patient RS began seeking treatment and/or medical services from Relator's Facilities.

237. On or around December 31, 2018, after receiving a request for reimbursement for treatment following Patient RS's accident, Defendant State Farm arbitrarily issued a partial payment, a fraction of the amount owed, for billed charges because "This is the Average Wholesale Price (AWP) for generic drugs contained in the Medi-Span pricing database."

238. Patient RS had sought treatment from Relator's Facilities, among others, related to injuries sustained in his motor vehicle accident.

239. All or some of Patient MAS's bills related to his motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligations to pay them.

**Patient VCS**

240. On or around October 7, 2017, Relator's Facilities' patient, VCS, was the passenger in a motor vehicle when another vehicle "disregarded the stop sign", causing the vehicle Patient VCS was riding in to T-bone the other vehicle. **Exh. P** – VCS Crash Report.

241. Pursuant to the order of priority for No-Fault insurance carriers, Defendant State Farm was the top priority for Patient RS's motor vehicle accident.

46

242.   Patient VCS began seeking treatment and/or medical services from Relator's Facilities.

243.   On or around August 21, 2018, Defendant State Farm issued an EOB regarding its nonpayment of medical treatment bills received in relation to Patient VCS's accident.   Defendant State Farm's EOB further stated, "The product, service or accommodation was not reasonable and necessary for the injured person's care, recovery or rehabilitation…"   Defendant State Farm's EOB further claimed that "The injury did not arise out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle…"

244.   On or around January 18, 2019, Defendant State Farm placed Patient VCS's request for benefits "under investigation."

245.   Patient VCS had sought treatment from Relator's Facilities and Western Slope, among others, related to injuries sustained in her motor vehicle accident.

246.   All or some of Patient VCS's bills related to her motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligations to pay them.

**Patient DW**

247.   On or around August 23, 2018, Relator's Facilities' patient, DW, was involved in a motor vehicle accident when she was rear-ended while entering a

47

parking lot off of a main road and the other driver "failed to stop in assured clear distance…"   Patient DW had No-Fault insurance through Defendant State Farm. **Exh. Q** – DW Crash Report.

248.   Patient DW filed a claim with her insurer, Defendant State Farm.

249.   Patient DW also began seeking treatment and/or medical services from Relator's Facilities.

250.   On or around December 4, 2018, Defendant State Farm placed Patient DW's request for benefits "under investigation."

251.   Upon information and belief, Defendant State Farm never formally denied Patient DW's coverage, although Defendant did not submit payment for any of its contractually-obligated duties.

252.   Patient DW had sought treatment from Relator's Facilities and Western Slope, among others, related to injuries sustained in her motor vehicle accident.

253.   All or some of Patient DW's bills related to her motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligations to pay them.

**Patient EW**

254.   On or around August 28, 2018, Relator's Facilities' patient, EW, was involved in a motor vehicle accident when she collided with another driver while

pulling onto a main road.  Patient EW was "transported to Beaumont Wayne for possible back/neck injuries."  **Exh. R** – Patient EW Crash Report.

255.   Patient EW filed a claim with her insurer, Defendant State Farm.

256.   Patient EW also began seeking treatment and/or medical services from Relator's Facilities.

257.   On or around November 9, 2018, Defendant State Farm placed Patient EW's request for benefits "under investigation."

258.   Upon information and belief, Defendant State Farm never formally denied Patient EW's coverage, although Defendant did not submit payment for any of its contractually-obligated duties.

259.   Patient EW had sought treatment from Relator's Facilities and Western Slope, among others, related to injuries sustained in her motor vehicle accident.

260.   All or some of Patient EW's bills related to her motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligations to pay them.

**Patient RMY**

261.   On or around January 11, 2018, Relator's Facilities' patient, RMY, was involved in a motor vehicle accident when she was rear-ended by another

49

vehicle while exiting a parking lot.  Patient RMY had No-Fault insurance through Defendant State Farm.  **Exh. S** – RMY Crash Report.

262.   Patient RMY filed a claim with her insurer, Defendant State Farm.

263.   Patient RMY also began seeking treatment and/or medical services from Relator's Facilities.

264.   On or around June 12, 2018, Defendant State Farm placed Patient RMY's request for benefits "under investigation."

265.   Upon information and belief, Defendant State Farm never formally denied Patient RMY's coverage, although Defendant did not submit payment for any of its contractually-obligated duties.

266.   Patient RMY had sought treatment from Relator's Facilities and Western Slope, among others, related to injuries sustained in her motor vehicle accident.

267.   All or some of Patient RMY's bills related to her motor vehicle accident were covered by Medicare and/or Medicaid, despite State Farm's obligations to pay them.

**Summation of Defendant' Fraudulent Activity**

268.   By denying each of the above patients and others not listed in this instant action (both in the State of Michigan and across the United States), Defendant is able to circumvent its obligations to pay for reasonable and necessary

medical bills, and instead passing off that obligation onto the United States and State of Michigan, causing the governments to pay monies and sustain financial loss.

269.  This also results in essentially using the government as an interest-free bank or money source in providing payments to victims (the insureds) – with no reimbursement being made by Defendant, as required – that Defendant should have made earlier, resulting in substantial savings or windfall to Defendant.

270.  Also, as to their reporting obligations to the government, by denying claims, Defendant does not have to file ORM reports (as discussed above) indicating its ongoing responsibility for medical bills, leaving Medicaid/Medicare without any knowledge of the insured's proper insurance to collect No-Fault benefits.

271.  Or, in the alternative, Defendant reports its insureds on the ORM report to the government indicating that it is responsible as to the ongoing medicals for the insureds, but in reality does not actually discharge its responsibility to make payments for medical expenses incurred (by delaying or denying coverage to the insureds), leaving Medicaid/Medicare again to make the payment of medical expenses incurred without being reimbursed.

272.  As a result, Defendant routinely submits false reports (by either omitting the names of its insureds that had their claims arbitrarily denied, or

including their names in ORM reports without actually making payments), which impedes the United States' and State of Michigan's ability to recover on payments made.

273. Defendant also runs afoul of its implied certification of complying with all Medicare and Medicaid laws in order to be a participant in the sale of insurance in the State of Michigan.

**Medication Fraud and Other Wrongful Acts**

274. Another instance of fraud committed by Defendant centers on medical prescriptions and medication for its injured insureds.

275. Indeed, up until around six months ago, State Farm had refused to pay for the prescription and laboratory bills for the Relator's Facilities, where State Farm routinely placed each claim under investigation, as if every single bill submitted is not covered, regardless of its reasonableness or necessity.

276. Recently, and for reasons unexplained as to why its practice of nonpayment on all bills has changed, State Farm has made some partial payments on some bills sent by Relator's Facilities.

277. In instances where Defendant delayed or failed to timely pay No-Fault auto-related benefits for its injured insureds involving prescriptions to obtain medication, insureds were left with no choice but to use their Medicaid/Medicare

cards.  Defendant then routinely failed to reimburse the federal government for payments made for medication.

278.  Additionally, under the Medicare Secondary Payer Act, generally a practical means for reimbursement of Medicare/Medicaid payments to the federal government is when the insured files suit and obtains a recovery.  However, many suits are either dismissed, no suits are filed at all, amounts of bills do not justify a suit, or State Farm does not disclose the identity of its insured that had their claims arbitrarily denied, leaving no other means to reimburse the federal government, or with no information on which to seek reimbursement, for Medicare/Medicaid payments made.

279.  Upon information and belief, Defendant's practice of dodging or circumventing their obligation to timely pay No-Fault benefits to its injured insureds, and instead compel the federal government to pick up the tab without reimbursement, is not limited to cases in Michigan.

280.  Finally, as part of its ploy to delay and deny claims, Defendant targets pain centers and/or medical providers by retaining law firms to aggressively intimidate and sue such providers, by summarily alleging that *all* claims submitted by the targeted provider are fraudulent to justify its knowing and intentional decision to not pay any claim despite having independent insurance policies with each insured.

281.    In other words, under the guise that pain centers and/or medical providers are allegedly engaging in fraudulent submission of claims, without even considering their insured's actual needs for the services provided and its duty to cover those costs pursuant to individual policies and/or contracts with those insureds, Defendant aggressively pursues legal actions through its lawyers against those providers to escape paying any and all claims – resulting in patients having to resort to their Medicaid and/or Medicare cards to cover the costs for services rendered, thus, increasing the obligation on the United States.

282.    Defendant has also turned to contentious racketeering lawsuits, such as those under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and conspiracy claims, against medical clinics, MRI centers, pharmacies, and individual doctors, among others, to deter medical providers from billing them for treatments related to their insured's reasonable expenses as a result of their motor vehicle accident.

283.    Defendant brings these lawsuits alleging some clinics are ordering needless tests to inflate their own insurance reimbursements but it actually serves as a disincentive for those providers to bill Defendant.

284.    Indeed, Defendant is really trying to exploit or circumvent the Secondary Payer Act and Michigan's No-Fault Act as part of a manifest effort to

suppress medical providers' right to reimbursement, and to pass off its obligations to the government.

285.   Defendant has been abusing racketeering laws by trying to shut down legitimate clinics that simply treat No-Fault patients.

286.   In the lawsuits, Defendant groups hundreds of No-Fault claims from clinics, rather than disputing individual claims on their merits in local courts.

287.   Once the RICO case is filed, insurers, such as Defendant, will typically refuse to pay the many outstanding claims from the clinics that it sues.

288.   Upon information and belief, State Farm has brought several lawsuits in Michigan state and federal courts, with similar claims of RICO and conspiracy, in recent years.

289.   One of these abusive lawsuits has been levied against Relator himself recently, while another was threatened to be filed against Relator – and entities related to Relator – to induce a settlement of lawsuits filed to recover outstanding bills for treatment of Defendant State Farm's insureds.

290.   For example, around 2011, entities related to Relator brought four medical provider actions against State Farm to recover outstanding bills unpaid by Defendant State Farm.   During the pendency of those actions, Defendant State Farm threatened to file a RICO action against Relator and the entities suing State Farm in order to reach a more favorable settlement for Defendant.

291. Now, after Relator established a pharmacy and laboratory unit (Relator's Facilities) and began billing Defendant State Farm for their treatment of Defendant's insureds, Defendant initiated a RICO suit without making payments for reasonable expenses incurred for the treatment of its injured insureds. *See Eastern District of Michigan, case # 19-10669.*

292. Defendant State Farm's threats, lawsuit, and allegations raised have had a chilling effect on payments from other insurance companies.

293. The filing of a RICO action against a medical provider, such as Relator's Facilities, and the allegations contained therein may become the basis for other insurance companies to deny payment or to pay lesser amounts, leaving Medicare and/or Medicaid to sustain additional loss.

294. Indeed, two insurers have become notorious for engaging in such aggressive lawsuits, State Farm and Allstate, whereupon both had their adjusters trained by the same consulting company – McKinsey – that originally formed the delay, deny, defend tactics.[6]

---

[6] Both State Farm and Allstate have also become notoriously known for being liable for millions of dollars for engaging in egregious misconduct. Indeed, State Farm was ordered to pay over $250 million for an elaborate illegal scheme to replace damaged parts of cars with inferior replacements. **Exh. T**. Allstate was fined $25,000 per day by a Florida judge and banned from writing insurance in said state (**Exh. U**) for refusing to turn over documents related to its claim processing.

295.   Historically, State Farm and Allstate have been rated among the worst insurance companies by reputable consumer advocacy enterprises, such as Consumer Reports, J.D. Power & Associates, and the American Association for Justice, based on their claim resolution tactics, policies, practices, consumer reviews, and other data.  **Exh. V** – AAJ Report; **Exh. W** – Clark Howard Report.

## COUNT I
## VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(A)

296.   Relator incorporates by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

297.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, ("FCA"), as amended.

298.   Indeed, by being a participant in coordinating payments with the Federal government consistent with federal law, Defendant certifies its compliance with all applicable Medicare and/or Medicaid laws, including the Medicare Secondary Payer Act.

299.   However, instead of abiding by federal law, Defendant has saved at least hundreds of millions of dollars by circumventing the Medicare Secondary Payer Act, forcing the federal government to essentially act as the primary payer for paying bills instead of being a secondary payer, as required by law, thus,

causing the government to sustain financial loss on monies paid out that were supposed to be paid, or at least reimbursed, by Defendant.

300. Additionally, by arbitrarily denying medication and laboratory bills submitted by Relator's entities that involved reasonable and necessary treatment and care for the auto-injuries of Defendant's insureds (including those on Medicare), Defendant is able to circumvent its legal obligations to file accurate ORM reports for those denied claims to the federal government.

301. For example, as a result of arbitrarily delaying and/or denying claims submitted by Relator's Facilities, Defendant either: 1) conceals those insureds on Medicare from being listed on the ORM report, leaving the government with insufficient information as to those Medicare beneficiaries that may have a primary payer, such as Defendant, so the government can try to seek reimbursement from Defendant; or 2) reports its insureds' submitted claims on the ongoing responsibility for medical report ("ORM"), but not actually discharging those responsibilities in paying the claims (by denying coverage to its insureds) which amounts to false reporting.

302. Further, by denying coverage to their insureds – although they may have been listed on the ORM reports by Defendant – the government ends up paying for the medical services and never gets reimbursed, as required under the Secondary Payer Act. This is especially the case if no suit has been filed by its

insured against their own insurance company – which is the typical means for the government to get reimbursed in the event of a verdict, settlement, or judgment in a court of law.

303.   Such false and/or improper reporting has caused the federal government to pay Medicare recipients without being able to seek reimbursement from the primary payer, Defendant State Farm.

304.   This elaborate scheme perpetrated by Defendant to arbitrarily delay and/or deny claims submitted by Relator's Facilities for prescriptions and laboratory work, regardless of the 1) validity of the claims, and 2) the insurance contract with the insured, has cost the taxpayers and federal government hundreds of millions of dollars in wrongfully paid bills by the secondary payer, Medicaid and/or Medicare.

**WHEREFORE** for the reasons discussed, Relator requests this Honorable Court enter judgment in his favor against Defendant for treble damages, fines for each false claim submitted, and other damages as provided for under the FCA, in addition to attorney fees as provided for under the FCA, and any other relief this Court deems just and equitable.

## COUNT II
## VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(G)

305.   Relator incorporates by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

306.   By virtue of the acts described above, Defendant also knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government by, among other things: 1) delaying and/or failing to honor its obligations to its insureds following its insured's motor vehicle accident to pay No-Fault benefits timely, resulting in its insureds resorting to their back-up option of submitting their claims to Medicaid and/or Medicare to receive benefits; and 2) failing to then timely, if at all, reimburse the federal government for payments made by the United States.

307.   As such, Defendant violated the FCA and MMFCA and is liable for all damages, penalties, fines set forth in those acts, as well as all other applicable relief.

**WHEREFORE** for the reasons discussed, Relator requests this Honorable Court enter judgment in his favor against Defendant for treble damages, fines for each false claim submitted, and other damages as provided for under the FCA, in

addition to attorney fees as provided for under the FCA, and any other relief this Court deems just and equitable.

## COUNT III
## VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIM ACT
## MCL 400.601 *et seq.*

308.   Relator incorporates by reference each and every preceding paragraph as if each was set forth again at length here, sentence for sentence and word for word.

309.   The above actions and omissions, including representations that Defendant is in compliance with all federal and state laws, are in violation of the MMFCA.

310.   As such, Defendant is liable for all damages, penalties, and fines set forth in those acts, as well as all other applicable relief.

**WHEREFORE**, Relator Michael Angelo, by and through his attorneys, on behalf of the United States of America and State of Michigan, respectfully request judgment be entered in their favor against Defendant, including treble the amount of the United States' and State of Michigan's damages; any and all additional compensation, penalties, fines, damages, and relief allowable under the *Qui Tam* provisions of the Federal False Claims Act (31 U.S.C. § 3729 *et seq.*) and the Michigan Medicaid False Claim Act (MCL 400.610a); costs, interest, and attorney

fees; and other applicable legal and/or equitable relief that this Court deems just and applicable.

## **PRAYER FOR RELIEF**

Relator also respectfully requests an applicable percentage of the total award as determined by this Honorable Court to be just and equitable and taking into consideration, among other things, whether the United States government and/or State of Michigan intervenes in this action.

Respectfully submitted,

AKEEL & VALENTINE, PLC

By: _____
    Shereef H. Akeel (P54345)
    Hasan Kaakarli (P81099)
    Attorneys for Plaintiff
    888 W. Big Beaver Road, Ste. 420
    Troy, MI 48084
    (248) 269-9595
    shereef@akeelvalentine.com
Dated:  July 24, 2019    hasan@akeelvalentine.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | Civil Action No. 19-12165 |
| THE STATE OF MICHIGAN, | ) | |
| *Ex. Rel.* MICHAEL ANGELO | ) | Hon. Arthur J. Turnow |
| | ) | Magistrate Steven Whalen |
| Plaintiffs, | ) | |
| | ) | **FILED *IN CAMERA* AND** |
| vs. | ) | **UNDER SEAL** |
| | ) | |
| STATE FARM MUTUAL AUTOMOBILE | ) | **FALSE CLAIMS ACT** |
| INSURANCE COMPANY, | ) | **MEDICAID FRAUD** |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMAND** |

## **JURY DEMAND**

**NOW COMES** Relator, MICHAEL ANGELO, by and through his attorneys, AKEEL & VALENTINE, PLC, and hereby demands a trial by jury of the above-captioned cause of action.

Respectfully submitted,

AKEEL & VALENTINE, PLC

By: _____
Shereef H. Akeel (P54345)
Hasan Kaakarli (P81099)
Attorneys for Plaintiff
888 W. Big Beaver Road, Ste. 420
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
hasan@akeelvalentine.com

Dated:  July 24, 2019