```
 1                        UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF MICHIGAN
 2                              SOUTHERN DIVISION

 3    MICHAEL ANGELO,

 4                   Plaintiff,

 5    -v-                                    Case No. 19-12165

 6    STATE FARM MUTUAL AUTOMOBILE
      INSURANCE COMPANY, et al.,
 7
                     Defendant.
 8    _____/

 9                            MOTION HEARING

10              BEFORE THE HONORABLE DENISE PAGE HOOD
                       United States District Judge
11              Theodore Levin United States Courthouse
                       231 West Lafayette Boulevard
12                          Detroit, Michigan
                           December 7, 2022
13
      APPEARANCES:
14
      FOR THE PLAINTIFF:      Shereef H. Akeel
15                            Samuel R. Simkins
                              Akeel & Valentine, Plc
16                            888 W. Big Beaver, Suite 420
                              Troy, MI 48084
17
                              John William Cleary, Jr.
18                            Ryan Hy Susman
                              MSP Recovery Law Firm
19                            2701 S. LeJeune Rd., Suite 10th Floor
                              Miami, FL 33134
20
                              Jose Alfredo Armas
21                            Armas Bertran Pieri
                              4960 SW 72 Ave., Suite 206
22                            Miami, FL 33155

23    FOR THE                 Bryce L. Friedman
      DEFENDANTS:             Kathryn Wheelock
24                            Simpson Thacher & Bartlett LLP
                              425 Lexington Avenue
25                            New York, NY 10017
```

```
 1   APPEARANCES              Emily Newton
     CONTINUED FOR THE        King & Spalding
 2   DEFENDANTS:              1180 Peachtree St. NE
                              Suite 1600
 3                            Atlanta, GA 30309

 4                            Jordan S. Bolton
                              Clark Hill PLC
 5                            151 S. Old Woodward Ave.
                              Suite 200
 6                            Birmingham, MI 48009

 7                            Douglas W. Baruch
                              Morgan, Lewis & Bockius LLP
 8                            1111 Pennsylvania Ave, NW
                              Washington DC, DC 20004
 9
                              Robert C. Folland
10                            Barnes & Thornburg LLP
                              41 South High Street
11                            Suite 3300
                              Columbus, OH 43215
12

13

14

15

16

17

18

19

20

21

22

23              To Obtain a Certified Transcript Contact:
          Shacara V. Mapp, CSR-9305, RMR, FCRR, CRR
24                   www.transcriptorders.com

25
```

1                         <u>TABLE OF CONTENTS</u>

2     <u>MATTER</u>                                              <u>PAGE</u>

3     **MOTION HEARING**                                         3

4     WITNESSES:

5     None .....................................................

6     EXHIBITS RECEIVED:

7     None Offered .............................................

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Detroit, Michigan
 2   December 7, 2022
 3   2:04 p.m.
 4                              *      *      *
 5           CASE MANAGER:  All rise.
 6           United States District Court for the Eastern District
 7   of Michigan is now in session.  The Honorable Denise Page Hood
 8   presiding.
 9           You may be seated.
10           Calling Case Number 19-12165, Michael Angelo and MSP
11   WB, LLC, et al., versus State Farm Mutual Automobile Insurance
12   Company, et al.
13           Counsel, please place your appearances on the record.
14           MR. ARMAS:  Good afternoon, Judge.  May it please the
15   Court, Alfredo Armas of Armas, Bertran, Zincone, on behalf of
16   the relators, Michael Angelo, and MSP Recovery WB.
17           THE COURT:  Okay.  Good afternoon to you.
18           Who is with you?  Oh, everyone's going to speak.
19   Okay.
20           MR. ARMAS:  Judge, if you want, this is John Cleary
21   from MSP Recovery Law Firm, and to his right is my friend
22   Shereef Akeel of Akeel & Valentine, who is also co-counsel for
23   the relators.
24           THE COURT:  Okay.
25           MR. AKEEL:  Good afternoon, Judge.
```

```
1              MR. CLEARY:  Good afternoon.
2              THE COURT:  Good afternoon.  How are you?  How are
3    both of you?
4              MR. CLEARY:  Good, Your Honor.
5              THE COURT:  Good.
6              Thank you.  Counsel.
7              And for the defendants.
8              MR. FRIEDMAN:  Good afternoon, Your Honor.  My name
9    is Bryce Friedman.  My firm is Simpson, Thacher, and Bartlett.
10   We represent the Travelers defendants and the Berkshire
11   Hathaway defendants.  With me is my colleague, Kate Wheelock.
12   We will be addressing the Court in support of a motion to
13   dismiss on behalf of all the defendants.
14             THE COURT:  Okay.
15             Ms. Wheelock, is it common spelling of Wheelock?
16             Ms. WHEELOCK:  I'm not sure what the common spelling
17   is, Your Honor, but it's W-h-e-e-l-o-c-k.
18             THE COURT:  Yeah, common spelling.  Thank you.
19             MS. WHEELOCK:  Great.  Thank you, Your Honor.
20             THE COURT:  All right.  Your firm has an appearance
21   filed?
22             MR. FRIEDMAN:  Yes, Your Honor.
23             THE COURT:  Okay.  Which would include her; is that
24   correct?
25             MR. FRIEDMAN:  That is correct.
```

```
 1            THE COURT:  Okay.  And you're not expecting -- are
 2   any other counsel here?
 3            MS. NEWTON:  Good afternoon, Your Honor.  I'm Emily
 4   Newton from the Law Firm of King and Spalding.  I represent
 5   the Progressive defendants --
 6            THE COURT:  Okay.
 7            MS. NEWTON:  -- and also Auto Club.  With me is
 8   Jordan Bolton from Clark Hill.
 9            THE COURT:  Jordan Bolton?
10            Ms. Newton:  Yes.
11            MR. BOLTON:  Good afternoon, Your Honor.
12            THE COURT:  Okay.  Good afternoon to both of you.
13            And for State Farm?
14            MR. BARUCH:  Good afternoon, Your Honor.  Doug Baruch
15   from Morgan, Lewis on behalf of State Farm.
16            THE COURT:  Okay.  Good afternoon.
17            And one more.  Robert Folland.
18            MR. FOLLAND:  Yes.  Afternoon, Your Honor.  Robert
19   Folland from Barnes and Thornburg on behalf of ISO, which
20   stands for Insurance Services Office.
21            THE COURT:  Okay.  There wasn't room for you up
22   front?
23            MR. FOLLAND:  I'm happy to move up right now, Your
24   Honor.
25            THE COURT:  Okay.  Anybody else?  No?
```

```
 1              Okay.  Is there room?  I think there's room, isn't
 2    there?
 3              MR. ARMAS:  Judge, we have room over here for
 4    Mr. Folland.
 5              THE COURT:  What are you -- do you need one more
 6    chair over there?  No?  Are you okay?  Okay.  You're okay?
 7              MR. FOLLAND:  Yes.
 8              THE COURT:  All right.
 9              Okay.  This is the defendants' motion to dismiss the
10    amended complaint, and there are a few other motions to
11    dismiss as well.  And I think you've organized yourselves
12    relative to my request, that you organize to make oral
13    arguments; is that right?
14              MR. FRIEDMAN:  That's correct, Your Honor.
15              Bryce Friedman again from Simpson Thacher.  I'll be
16    presenting the main argument on behalf of the defendants.
17              THE COURT:  Okay.  Very good.
18              Okay.
19              MR. ARMAS:  Judge, if I may.  On behalf of the
20    relators and co-relators, Mr. Akeel will be addressing any
21    discrete issues regarding the State Farm/Michael Angelo
22    dispute, which is pending in front of Judge Cleland and the
23    Sixth Circuit Court of Appeals.
24              THE COURT:  Okay.  All right.
25              And then, are there other people arguing also?  I
```

```
 1    have that you're making an argument.  Is Mr. Cleary making an
 2    argument?
 3            MR. ARMAS:  Mr. Cleary will not, Judge, he will
 4    assist me.
 5            THE COURT:  Okay.  What does that mean?  He's not
 6    going to orally make a presentation?
 7            MR. ARMAS:  That's correct, Judge.
 8            THE COURT:  Okay.  But I think what you're telling me
 9    is that Mr. Akeel is going to make an oral presentation?
10            MR. ARMAS:  That is correct, Judge.
11            THE COURT:  Okay.  Will you be making the first
12    response?
13            MR. ARMAS:  Yes, I will.
14            THE COURT:  Okay.  All right.  Then, let's proceed.
15            But I would like you to go to the microphone if you
16    don't mind.
17            MR. FRIEDMAN:  Good afternoon, again, Your Honor.
18            THE COURT:  Good afternoon.
19            MR. FRIEDMAN:  May it please the Court, again my name
20    is Bryce Friedman, on behalf of the Travelers defendants, the
21    Berkshire Hathaway defendants.  And again, I'm going to be
22    arguing the omnibus motion to dismiss on behalf of all of the
23    defendants.
24            This is a case alleging violations of the False
25    Claims Act by more than 300 insurance companies.  Plaintiffs
```

1    purport to bring this case on behalf of the U.S. Government, a

2    number of states, and Puerto RICO.  Not one of those

3    governments has chosen to intervene in this case, or objected

4    to dismissal.

5            The thrust of the complaint in this case is an

6    assertion that defendants failed to report liability insurance

7    coverage to Medicare, and that eventually deprived some

8    private health insurers of money.

9            I intend to focus my time on the argument that the

10   complaint should be dismissed as a matter of law.  I won't

11   repeat what's in the substantial papers that have been filed,

12   but I will get, or try to get to the heart of the very

13   disputed issues.

14           There are a number of ancillary motions related to

15   taking judicial notice of certain documents, motions to

16   strike, request to supplement the record, and the like.  I

17   plan on addressing those only briefly and in passing, to the

18   extent necessary, as part of my substantive argument unless

19   the Court has a different preference.

20           And to the extent the Court has what I would consider

21   to be specific and detailed questions about those issues,

22   Ms. Wheelock is here to address them.

23           So I will proceed to my argument as to why the

24   complaint should be dismissed, for two reasons.  And, of

25   course, I welcome Your Honor's directions or questions along

 1    the way.

 2              THE COURT:  Okay.  Thank you.

 3              MR. FRIEDMAN:  First, the complaint fails to plead

 4    the elements of the False Claims Act violations as required by

 5    Rules 8 and 9(b).

 6              Second, the Court should dismiss the case pursuant to

 7    the False Claims Act public disclosure bar set forth in

 8    Section 3730(e)(4), Title 31 of the U.S. Code.

 9              We've recently submitted a notice of supplemental

10    authority to the Court, to make Your Honor aware of Judge

11    Murphy's decision in an almost identical case against a group

12    of insurers under the Allstate banner.  That's civil Case

13    Number 19-11615.

14              Judge Murphy dismissed the substantive False Claims

15    Act counts against Allstate based on the public disclosure

16    bar, which is the same grounds that the defendants in this

17    case have moved on against a virtually identical complaint.

18    The same public disclosure bar reasoning applies with equal

19    force here.

20              So with the Court's indulgence, I will begin my

21    argument with the public disclosure bar.  Section

22    3730(e)(4)(A), says that, quote, "The Court shall dismiss an

23    action substan -- an action when it's based on substantially

24    the same allegations or transactions as alleged in the action

25    or claim where publicly disclosed."

1            I butchered that.  I apologize.

2            Relevant to this case, the public disclosure bar

3       applies where the disclosure is:  (1) in a federal hearing

4       where its government or its agent is a party; or (2) in the

5       news media.

6            Here, substantially the same industry wide

7       allegations of a scheme not to report liability insurance to

8       Medicare were publicly disclosed, starting at least eight

9       years ago in two other cases brought under the False Claims

10      Act.  One that I'm going to call Hayes, and the second that

11      I'm going to call Takemoto.  There's also a series of news

12      articles reporting on those cases and the fraudulent scheme

13      alleged in those cases and these cases that are the subject of

14      our request for judicial notice.

15           The public complaint that we say is a disclosure in

16      the Hayes case is found at ECF 339-37.  The public complaint

17      in the Takemoto case is found at ECF 339-36.  And the news

18      article I may discuss, which reports on same, is found at ECF

19      339-29.

20           The Hayes and Takemoto cases like this one, alleged

21      an industry-wide scheme by insurers, and their service

22      providers to underreport liability insurance to Medicare.

23      Thereby, reducing insurance companies' obligations to private

24      health insurers that contract with Medicare.

25           The key statutory inquiry for purposes of the public

1   disclosure bar is whether the prior complaints put the

2   Government on notice of the alleged fraud that is asserted in

3   this case before Your Honor.  Takemoto and Hayes did just

4   that.

5        The three complaints, Hayes, Takemoto and this one,

6   are substantially the same for purposes of the public

7   disclosure bar.  And therefore, respectfully, the Court is

8   required -- shall dismiss according to the statute.  The

9   substantially same standard is located in the statutory text

10  and discussed at length in the Sixth -- by the Sixth Circuit

11  in a case called U.S. ex rel. Maur, M-a-u-r, 981 F.3d 516.

12  That's from 2020.

13       Now, the public disclosure bar applies because

14  Takemoto and Hayes complaints are stantially -- substantially

15  the same as this one.  All three allege a scheme to

16  underreport liability insurance to Medicare.

17       There need not be an identity of allegations.  There

18  need not be an identity of allegations, even as to time,

19  place, and manner, to trigger the public disclosure bar once

20  the Government knows the essential facts of a scheme and has

21  enough information to discovery related frauds.

22       Judge Murphy's Allstate opinion does a thorough job

23  of explaining exactly why the Takemoto's and Hayes' complaints

24  are public disclosures, and are substantially the same as the

25  complaint here.  He said, quote, "It is hard to imagine facts

1     that more closely align with the relators' allegation than

2     what Takemoto entail."  End quote.

3              So I'm not going to redo what Judge Murphy did, and

4     I'll be brief.  I'm just going to focus on relators'

5     arguments, the plaintiffs in this case, I'll sometimes call

6     relators, why their complaint is different than the public

7     disclosures.

8              Page 10 of relators' opposition, ECF 376, page ID

9     3905, summarizes in bullets, the substance of the allegations

10    of its complaint, and why it thinks it's somehow different.

11             The first bullet talks about the willful failure to

12    report to Medicare, and this is why they think they're

13    different, after specific notice from the relators.  In other

14    words, these relators said they went and told the defendants,

15    you guys got to do a better job of complying with Medicare.

16             But as Judge Murphy found on page 23 of his Allstate

17    opinion, that allegation is nearly identical to a claim in

18    Takemoto, which says, quote, "Defendants were aware of their

19    obligations to make payments, both due to the well-established

20    nature of the statute, and because Dr. Takemoto repeatedly

21    contacted defendants and provided them with a detailed

22    explanation of their rights and liabilities under the

23    statute."

24             It's practically identical, what these relators say

25    and what was said in the Takemoto case.  This shows that

1    Takemoto disclosed the exact theory of fraud that the relators

2    in this case say make this case unique.

3           The second and third bullet points on page 10 of

4    relators' brief talk again, about the willful failure to

5    report.  And they say they're special and different in this

6    case, because they have certain exemplars that contain

7    specific information.  And they say just in broad strokes that

8    there were lots and lots of other instances.

9           Well, in Rahimi, which is the Sixth Circuit decision

10   from 2020, and I'll provide the cite in a minute, the Sixth

11   Circuit said, quote, "A relator's claims cannot survive the

12   public disclosure bar because his allegations added some new

13   details to describe, essentially, the same scheme by the same

14   corporate actor as the publicly disclosed fraud."

15          Hayes and Takemoto alleged the same scheme in that

16   case as is alleged in this case.  Hayes alleged, quote, "A

17   national corporate practice as well as an industry-wide

18   scheme."

19          In paragraph 71 of Hayes' complaint, he said, quote,

20   "This scheme of avoiding, advising, or notifying Medicare as

21   well as avoiding reimbursing Medicare was fine-tuned by the

22   entire liability industry."

23          Not only that, but Hayes also disclosed specific

24   examples by name of the company and the particular claim, and

25   the individual employees who were allegedly involved with the

1    specific examples.

2          In paragraph 70 of Hayes' complaint, for example, and

3    I don't mean to pick on somebody, he made allegations against

4    the Geico defendants in Berkshire Hathaway.  Again, names,

5    dates, names of employees.

6          Paragraph 251 of Hayes, he made specific similar

7    allegations against my client, Travelers.  There's a whole

8    list in Exhibit C to the Hayes complaint at RJN 339-37.

9          Takemoto also alleged a wide rating scheme that

10   resulted in a large number of underreports.  Judge Murphy

11   summarized this at page 27 of his decision, and I'm not going

12   to go through and repeat that summary.

13         Suffice it to say, that relators' allegations in the

14   complaint, before the Court here, repeat the same story as

15   Hayes and Takemoto, that primary payers failed to create and

16   enforce the system identifying when their insurers were

17   covered by Medicare, which led to underreporting.  Here, they

18   claim they're different because they came up with a bunch of

19   specific examples that I'll discuss in a minute.  But that's

20   why they claim they're different.

21         But the Sixth Circuit in Rahimi said just adding new

22   examples doesn't make you different and take you outside the

23   public disclosure bar.

24         Okay.  So here's the last big difference in the

25   bullet points that relators provide.  Which is, that they

1    claim correctly, that in their complaint, there is a defendant

2    named ISO, capital I, capital S, capital O, which stands for

3    Insurance Services Office.  And cap -- the Insurance Services

4    Office was not a defendant in Hayes or Takemoto.  That's

5    correct.  However, that doesn't change the public disclosure

6    analysis, for a bunch of reasons.

7            First of all, as we'll get to in a second, the adding

8    defendants, just like adding details, when you allege in an

9    industry-wide scheme, doesn't matter for purposes of the

10   public disclosure bar, when the government is on notice of the

11   alleged fraud.

12           And in the Takemoto case, there were two entities

13   that were exactly like ISO, for purposes of the discussion

14   here, of the public disclosure bar.

15           Paragraphs 22, there's an entity in Takemoto called

16   Sedgwick Claims Management.  Paragraph 23, there's an entity

17   called BroadSpire.  Just like ISO, they are not insurance

18   companies.  They provide services to insurance companies.

19   Just because in one case you name Adam, and the next case you

20   name Bill, that doesn't take you outside of the public

21   disclosure bar.

22           In Maur, M-a-u-r, the Sixth Circuit says, once the

23   Government knows the essential facts of a scheme, it has

24   enough information to discover related frauds.

25           The addition of ISO to this complaint does not

1    remember -- render it any different than Hayes or Takemoto.

2           Based on the filing the relators did last night, in

3    which they provided the Court a bunch of charts about who was

4    in and who was out, I suspect they're going to argue, well,

5    not every defendant in this case was a defendant in Hayes or

6    Takemoto.  Well, in Takemoto, there were 56 defendants and 20

7    insurer groups.  In Hayes, there were 45 defendants and 18

8    insurer groups.  And here, there are 15 defendants --

9    defendant groups and 317 defendants.  Ten of the 15 defendant

10   groups overlap with those in Hayes or Takemoto.

11          But most importantly, for purposes of this, remember,

12   please, Hayes and Takemoto were about an alleged industry-wide

13   fraudulent scheme.  Industry wide allegations appears 22 times

14   in the Hayes complaint.  Paragraph 382 of the Hayes complaint

15   is just one example describe -- describing an industry-wide

16   scheme.

17          I submit the law settled on this point, that

18   identifying different defendants, whether they're corporate

19   affiliates, service providers, different members of the same

20   industry, does not rescue a complaint from the public

21   disclosure bar.  What matters is that the alleged fraudulent

22   scheme is the same.

23          Here's a quote again from Maur, 981 F.3d 526.  Quote,

24   "It also does not matter that Maur, the relator in that case,

25   has added another Tennova subsidiary, Tennova was the

1    defendant, its parent and Corbin, a service provider, as

2    additional defendants.  That's what the Sixth Circuit said.

3    It doesn't matter that all these random people got added.

4    Because the Government knew the essential facts of a scheme,

5    it had enough information to go out there and discover related

6    frauds.

7           Also important, in the Holloway case from the Sixth

8    Circuit, 2020.  I'll give you a full cite in a second.  The

9    Sixth favorably cited the seventh decision in Gear, g-e-a-r,

10   which is the sort of seminal case on the point that alleged

11   industry-wide fraud is enough to put the Government on notice.

12   And an additional complaint that identifies other industry

13   members and other examples of the same alleged fraud is not

14   enough to avoid the public disclosure bar.

15          Now, I just want to touch on something briefly

16   related to the public disclosure bar that Judge Murphy did not

17   reach in his case, which is the conspiracy count.  Which is

18   Count Two of the complaint in this case.

19          In addition to substantive violations of -- or

20   so-called reverse false claims, the relators here say there

21   was a grand conspiracy among all 317 defendants to -- to

22   violate the act.  I'll get to the quality of those allegations

23   shortly.

24          But I want to make the point clear, that the Court

25   can dismiss and should dismiss the conspiracy count based on

1    the public disclosure bar as well.  In addition to the

2    substantive violations, which were dismissed as Judge Murphy

3    did.  Judge Murphy just said he was going to get to the

4    conspiracy count later in an additional order, and he hasn't

5    done so as of today, to my knowledge.

6            So in U.S. versus Walmart, 858 Federal Appendix 876,

7    from 2021, the Sixth Circuit said, quote, "Conspiracy under

8    the FCA, meaning the False Claims Act, is derivative of the

9    substantive claims."  End quote.

10           Therefore, public disclosure of the allegedly

11   fraudulent scheme by the industry is sufficient to put the

12   Government on notice of the alleged conspiracy to accomplish

13   this scheme, and is substantially the same allegation of

14   fraud.

15           In other words, if the Government knew of the

16   industry-wide scheme, knowledge of an agreement among industry

17   members is substantially the same, and would not materially

18   add to the disclosed allegation.

19           And there are two cases that were relatively recently

20   decided from courts in the Second Circuit that are not cited

21   in our briefs, that specifically address this issue.  And I

22   would like to just cite them for the Court.  U.S. ex rel. CDK

23   551 F.3d 27, from the Southern District of New York.  And

24   Patriarca, P-a-t-r-i-a-r-c-a versus Siemens Health Care,

25   S-i-e-m-e-n-s, 295 F.3d 186, from the Eastern District of New

1  York.

2           Those cases are two recent examples where the Court

3  looked at conspiracy counts concerning the same fraud that was

4  publicly disclosed, and said that -- and said correctly, that

5  the conspiracy count merely provides color to the primary

6  violation that has been publicly disclosed.  The same thing

7  that is going on here.

8           Now, I'm going to just take a deep breath for one

9  second, and I would like to quickly run through the issue of

10  the sort of nits and nats that the relators raised to suggest

11  that the public disclosure bar doesn't apply.  And then, I'd

12  like to hopefully spend just a few minutes discussing Rule

13  9(b), if Your Honor has the patience for me.

14           First, the relators argue that you can't address the

15  public disclosure bar under Rule 12(B)(6) motion, like we have

16  now.  The relators are plainly wrong about that.

17           The statute says in no uncertain terms, that the

18  Court shall dismiss an action when the public disclosure bar

19  applies.  Defendants have raised the public disclosure bar in

20  Rule -- Rule 12 motions.  Relators' contention that the public

21  disclosure bar is an affirmative offense, and therefore can't

22  be raised at the motion to dismiss stage is simply a false

23  dichotomy.

24           Just because something can be an affirmative defense

25  doesn't mean it can't be raised by Rule 12 motion.  And I

1    think the -- the lack of merits to this contention is proven

2    by the fact that all the Sixth Circuit cases cited by both

3    sides dismiss cases based on the public disclosure bar in

4    response to -- in response to Rule 12(B)(6).

5         Every case also -- every case that the parties have

6    cited also take judicial notice of prior False Claims Act

7    cases.  Every case the parties have cited also take judicial

8    notice of news articles.  That's all I'm going to say about

9    those two points here.  I think they're relatively

10   non-controversial in the case law.  Case books are filled with

11   False Claims Act cases applying the public disclosure bar

12   based on prior federal complaints and prior news articles.

13   Even if you have to pay to get the news article the same way

14   you have to get a -- pay to get the Wall Street Journal, the

15   New York Times, or the Detroit paper.

16        The next sort of nit or nat that the Government --

17   that the relators argue is that the complaints in Hayes and

18   Takemoto can't be considered because the Government wasn't a

19   party.  Because just like the relators here, Hayes and

20   Takemoto filed the lawsuits themselves, and the Government

21   didn't care to intervene.

22        The Sixth Circuit decision in Holloway, at page 845

23   forecloses that argument.  The Sixth Circuit said we are

24   persuaded by the majority of district courts and our own

25   districts court's reasoning, and hold that the qui tam relator

1    is in all cases, the Government's agent under

2    3730(e)(4)(A)(1), end quote.

3            The next argument the relators made is that the Court

4    can't consider Hayes or Takemoto because neither of those

5    cases survived the Rule 12 motion.  And they were too vague

6    and unclear to -- to be a prior public disclosure.  That's

7    wrong for a whole bunch of reasons.  But I'll just start out

8    by saying they were no more vague or unclear than the

9    complaint here.

10           First, the statutory text of the False Claims Act

11   requires the Court to dismiss based on a public disclosure.

12   It doesn't limit the dismissal mandate in any way, shape, or

13   form, to complaints in prior litigations that survived the

14   motion to dismiss.  This Court should reject the invitation to

15   read words into the public disclosure bar that are not there.

16           Second, relator's position doesn't make any sense if

17   you consider the purpose of the statute, which is to bar

18   so-called parasitic lawsuits.  One's based on information

19   known or knowable to the Government.

20           Every qui tam lawsuit that comes with a disclosure

21   statement, whether it passes a Rule 12 dismissal or not, it is

22   made known to the Government.

23           If you think about the statute -- if you think about

24   the statute for a second, if a news article is enough to

25   trigger the public disclosure bar, which is what the statute

1    says, news articles don't have to pass Rule 12.  So the idea

2    that there's some special rule that applies to complaints

3    having to pass Rule 12 doesn't make any sense.

4         The relators rely on a single case from the Sixth

5    Circuit called Walburn, capital W, -a-l-b-u-r-n.  With due

6    respect to my adversaries, I think that's a misleading

7    citation.  Walburn is not a public disclosure bar case.  It is

8    a first-to-file bar case in an entirely different part of the

9    statute that is not being raised by defendants here.  The fact

10   is, there is no authority in the Sixth Circuit that has been

11   cited for the proposition that the public disclosure bar only

12   extends to cases that survive a motion to dismiss.

13        So again, I -- I'm going to refer the Court to

14   Holloway.  And this time, I'll provide the citation, 960 F.3d

15   836.  It's a Sixth Circuit, in 2020.  The Sixth Circuit

16   applied the public disclosure bar to a bunch of complaints

17   that had been dismissed under the False Claims Act.

18        THE COURT:  Okay.  Give the citation again.

19        MR. FRIEDMAN:  It is -- the name of the case is

20   Holloway.

21        THE COURT:  Right.

22        MR. FRIEDMAN:  960 F.3d 836, and it's from 2020.

23        THE COURT:  Okay.  Thank you.

24        MR. FRIEDMAN:  The next miscellaneous argument that's

25   been made is that the Hayes and Takemoto complaints are stale,

 1   they're too old.  Again, read the text of the statute.  The
 2   False Claims Act statute does not say that the public
 3   disclosure bar must have been recent, or within a certain
 4   amount of time.  It is entirely unqualified.  And the purpose
 5   of the statute is not consistent with having a time
 6   limitation.  If the Government knows, the Government knows.
 7   Sometimes the wheels of government spins slowly, but the
 8   Government knows.
 9           Again, in Holloway, the Sixth Circuit applied the
10   public disclosure bar to actions that had been dismissed a
11   decade earlier.  Even though they were ten years old, the
12   disclosure in those complaints to the Government barred the
13   case.
14           The last ground is -- that the plaintiffs rely on,
15   the relators rely on, is an actual exception to the public
16   disclosure bar that is in the statute.  And that is, the
17   public disclosure bar does not apply if the relators are,
18   quote, "an original source," end quote.
19           An original source is defined in the statute as one
20   of two things.  One or A, someone who, prior to a public
21   disclosure, has voluntarily disclosed to the Government, the
22   information on which the allegations or transactions in a
23   claim are based.  So we can take that one off the table
24   because I don't even think the relators claim that prior to
25   Hayes or Takemoto, they disclosed anything to anyone.

```
 1              So the exception that the relators are relying on is
 2    that they are -- they believe they are someone who has
 3    knowledge that is independent of, and materially adds to the
 4    publicly disclosed allegations or transactions, and that they
 5    voluntarily provided that information to the Government before
 6    filing this lawsuit that brings us here today.
 7              Taking the complaint -- well, let me just say this.
 8              The relators in this case do not satisfy the original
 9    source test.  They do not have independent knowledge that
10    materially adds to Hayes or Takemoto that they brought to the
11    Government before filing the complaint.
12              So they will say that their exemplars add --
13    materially add to the knowledge about the publicly disclosed
14    fraud.  For this one, I will point to what Judge Murphy said,
15    which is that the exemplars barely elaborate on the schemes
16    disclosed in Hayes and Takemoto.  And in any event, this
17    matter and this argument that they make is controlled by the
18    Sixth Circuit 2021 precedent in Rahimi versus Rite-Aid, which
19    I've already cited, and the 2021 precedent in Maur, M-a-u-r,
20    which I've already recited.
21              In Rahimi, the Sixth Circuit said, quote, "Offering
22    specific examples of the alleged fraud does not provide any
23    significant new information where the underlying conduct has
24    already been disclosed."  End quote.
25              That's at pages 831 to 832 of the Rahimi decision, 3
```

1    F.4th.

2        The Sixth Circuit went on.  "Even though Rahimi was

3    able to add state specific information and examples of

4    government beneficiaries paying more, offering specific

5    examples of the alleged fraud does not provide any significant

6    new information where the underlying conduct has already been

7    disclosed.

8        Rahimi's original input consists solely of putting

9    more flesh on the fraud scheme of which the bones were already

10   public.  It would be contrary to the purpose of the act to

11   extend the original source exception to such activities."  End

12   quote.

13       The same conclusion applies here.  At best, reading

14   the complaint here most generously, Angelo and MSP WB have

15   alleged additional examples of alleged fraud.  That is not

16   enough to make either of them an original source.

17       Relators' counsel is going to stand up and emphasize

18   that the way relators acquired these new examples was unique

19   to an affiliate of relator MSP WB.

20       You're going to hear a lot about proprietary computer

21   systems that can allegedly detect violations of the Medicare

22   Secondary Payer Act, and you're going to hear about a hundred

23   different lawsuits under the Medicare Secondary Payer Act that

24   allegedly support this system.  None of that matters for this

25   False Claims Act case.

         1          Hayes and Takemoto allege they saw the same fraud
         2    with their own eyes.  That relators here are going to say,
         3    well, they didn't use their eyes, they used the computers that
         4    they're sitting behind.  It doesn't mean that they've done
         5    anything other than add additional examples to a scheme that
         6    was already publicly disclosed.
         7          And lastly on this point, I'll note, Judge Murphy
         8    thought it significant to the original source analysis that
         9    the information these relators have, came from a non-party.
        10    And that's sort of against the idea or the plain meaning of
        11    the very simple words, original source.
        12          He felt, and I agree, that the commonsense concept
        13    doesn't apply in this circumstance because they got the
        14    information from non-parties who aren't even sitting here.
        15    And Judge Murphy cited some Tenth Circuit authority to support
        16    his view on that -- on that fact.
        17          So with that, I will conclude the public disclosure
        18    argument by saying, the public disclosure bar clearly applies
        19    because the complaint in this case is substantially the same,
        20    and that it alleges substantially the same fraud as the
        21    complaints in Hayes and Takemoto and the news articles that
        22    describe that.
        23          Relators are not entitled to the exception as an
        24    original source because they don't have independent knowledge
        25    that materially changes the game.  All they have at -- taking

1   them at their word is some additional examples.  And the Sixth

2   Circuit has made crystal clear, additional examples are not

3   enough.

4          So if the Court will indulge me for just a few more

5   minutes, I just want to say a few things about Rule 9(b) and

6   Rule 8 because I think they're particularly important.  And

7   I'd like to highlight some things that may not have came out

8   -- jumped off the page in the mountain that we've provided

9   you.

10         This is a False Claims Act case.  And I think it's

11  important to remember when the Court thinks about this case,

12  that it is not a case about regulatory violations that have

13  been alleged.

14         In a widely quoted opinion, the Fifth Circuit said,

15  the False Claims Act is not a generalized enforcement of vice

16  for federal statutes, regulations, and contracts.

17         We are here today, talking about fraud.  The Fifth

18  Circuit case is the Steury case, S-t-e-u-r-y, 625 F.3rd 262.

19         So the Sixth Circuit has been crystal clear about

20  this, United States ex rel. Owsley, O-w-s-l-e-y, versus Fazzi,

21  F-a-z-z-i, 18 F.4th 192, 2021.

22         The identification of at least one false claim with

23  specificity is an indispensable element of a complaint that

24  alleges a False Claims Act violation.

25         Our circuit, this is the Sixth Circuit speaking, has

1    opposed -- imposed a clear and unequivocal requirement that a

2    relator allege specific false claims when pleading a violation

3    of the act, thus under Rule 9(b), the identification of at

4    least one false claim with specificity, is an indispensable

5    element of a complaint that alleges false claims violations.

6            Rule 9(b) does not permit a False Claims Act

7    Plaintiff merely to describe a private scheme in detail, but

8    then simply allege that claims requesting payments must have

9    been submitted.  That means they have to have specific

10   examples of false claims for each of the 317 defendants.  They

11   do not.

12           They're -- and if you -- there's the Branham case

13   which was a Sixth Circuit 1999 case, 1999 West Law 618018,

14   which makes it clear that the example needs to be for each

15   defendant, as does the Second Circuit's opinion in Takemoto,

16   the very case we've been talking about so far this afternoon.

17           Relators are going to stand up and say, we're

18   entitled to a relaxed standard.  We don't need to do a

19   specific false claim, we're entitled to a relaxed standard.

20   There is no relaxed standard.  The Default Rule is that a

21   False Claims Act claimant must identify a representative claim

22   that was actually submitted to the Government for payment.

23   That's what the Sixth Circuit said.

24           Then they said, alternatively, a claimant can

25   otherwise allege facts based on personal knowledge, personal

1    knowledge with your own eyes, of billing practices supporting

2    a strong inference that particular identified claims were

3    submitted to the Government for payment.  Relators have

4    personal knowledge of nothing.

5          And let me tell you how strict that personal

6    knowledge standard is.  In the Owsley case, the one from '21,

7    2021, where the Sixth Circuit sat down this law, the relator,

8    Owsley was a nurse, saw medical billers changing the diagnosis

9    codes with her own eyes.  She saw them adding new codes that

10   were not supported by medical documentation.  She personally

11   touched and used those altered forms to complete her patient

12   plans of care.  And those forms, the next morning, were

13   submitted to Medicare.  The Sixth Circuit said that is not

14   enough without a specific example of fraud.

15         Ms. Owsley is not sitting at the table over there.

16   The relators have nothing near what Ms. Owsley had.  In terms

17   of personal knowledge, they have none.

18         So relators are going to get up and say, we have pled

19   examples.  Appendix B to the complaint has examples that

20   purport to pertain to five -- five of the 317 defendants.

21   There are major, major problems with the -- every single one

22   of the examples.  I don't have enough time, and I'm not going

23   to go through them all, but if the Court cares to take a look

24   at the supplemental briefing in which each defendant explained

25   the problems with each of the exemplars and look at most

1    tellingly, at the plaintiffs' response where they basically

2    said -- basically acknowledged the problem saying, yeah,

3    you're right, it doesn't really match our allegations, but it

4    doesn't matter because we have conspiracy allegations.

5         That's really their response.  Yeah, our examples

6    don't really make sense and match what we're saying, but go

7    look at our conspiracy allegations.

8         I'll just give you two.  The SC -- SZ, capital S,

9    capital Z, example involves Geico, ECF Number 20, page 488,

10   the top of the page says Berkshire Hathaway example.

11        Remember, the allegation of fraud in this case is

12   that claims were not reported to Medicare.  Before this

13   litigation was filed, Geico showed the relators that SZ was,

14   in fact, reported.  Relators' opposition, ECF 37, page 3369,

15   acknowledges that's true.  It acknowledges -- it says, SZ's

16   claim was reported to Medicare.

17        How could this possibly be an example of a claim not

18   being reported to get -- to Medicare?  This is an example.

19   The relators will just say, oh, don't worry about that,

20   they're conspiracy allegations.  The examples are just thrown

21   up there.  They have nothing to do with the alleged fraud.

22        One more example, my client, Travelers.  There's a

23   person named J.B., capital J, capital B, ECF 20, page 502.

24   J.B. slipped and fell in front of a restaurant in the Bronx,

25   New York.  J.B. sued the restaurant and the allegedly

```
 1   responsible people.  And Travelers is the insurer of the
 2   restaurant.  They're fighting that out as of yesterday, in the
 3   Bronx County, who's responsible for that liability.
 4        How is it possible -- it is not possible, that
 5   Travelers or Travelers' policy holder owes money to J.B.?
 6   Yet, the relators came in and said J.B. is owed money by
 7   Travelers.  It makes absolutely no sense.
 8        And again, you look at their opposition, and they're
 9   like, yeah, don't worry about it, just look at our conspiracy
10   claims.
11        I get -- there's story after story just like this.
12   The exemplars do not provide examples of the fraud that is
13   frankly taken from Hayes and Takemoto and supposed, or posited
14   in the complaint.
15        I bet a nickel that relators are going to get up here
16   and talk about the Eleventh Circuit decision in Metropolitan
17   Causality which was, again, submitted as supplemental
18   authority to Your Honor very recently.  In that case, an
19   affiliate of one of the relators here asserted claims under
20   the Medicare Secondary Payers Act against an insurance company
21   that's not a party to this case.
22        The plaintiff in the Metropolitan Causality case
23   alleged a private health insurer suffered an Article Three
24   injury under the Act, because the liability insured owed it
25   money.
```

1           The Eleventh Circuit said violations of the Medicare

2     Secondary Payer Act, that one insurer owed money to another

3     insure were sufficiently pled under Rule 8.  That is not the

4     case.  This case is subject to Rule 9(b).  The elements of a

5     Medicare Secondary Payer Act violation are not the elements of

6     a False Claims Act violation.

7           Remember how I started?  The False Claims Act is not

8     a general overarching regulatory statute designed to catch

9     every foot fault and every breach of contract involving

10    anything that touches the Federal Government.  It is a fraud

11    statute requiring all the traditional elements of fraud, and

12    not anything less.

13          And this brings me to, well, I guess I'm running out

14    of time, my last point, and I want to be clear about this.  In

15    the Metropolitan Causality case, the relators were saying, I

16    represent an insurance company and this other insurance

17    company owes me, an insurance company, more money.  A classic

18    insurer versus insurer dispute that happens every day of the

19    week.  There is no well-pled allegation, or even theory in

20    this case, of an actual False Claims Act violation because

21    there is no obligation to the Government at issue in this

22    case.

23          30 -- Section 3729(a)(1)(G) of the False Claims Act

24    is the statutory section under which relators are bringing

25    Count One of their complaint.  It is sometimes in the case law

1    known as a reverse false claim.  To prove liability, you need

2    to show that the defendant fraudulently failed to pay the

3    money -- pay money to the Government or reduced an actual

4    obligation to the Government.

5         Relators are complaining about defendants alleged

6    failures to pay private health insurers, not the Government.

7    Relators are complaining about the defendant's alleged

8    failures to pay private health insurers, not the Government.

9         In fact, these guys go around the country filing

10   hundreds of lawsuits that are the subject of our request for

11   judicial notice, asking these same defendants to pay the

12   private health insurers under the same exact theory, making

13   the same exact allegations, using the same exact words.  This

14   case has nothing to do with an obligation to the Government.

15        If the alleged obligation is to a private entity,

16   then it is not an obligation to the Government and there is no

17   reverse false claim under Section (a)(1)(G).

18        No matter what you think of the rest of their

19   complaint, this claim -- complaint must be dismissed pursuant

20   to Rule 12, because there is no obligation to the Government

21   pled.  U.S. ex rel. Petras, P-e-t-r-a-s, 857 F.3rd.  It's a

22   Third Circuit case from 2017.  And I cite it because it goes

23   through a very long and careful analysis of the obligation to

24   the Government requirement.

25        So the relators know they have a big problem here

1    with a lack of an obligation to the Government.  So in my

2    view, they've tried to get a little creative.  So let me just

3    deal with some of their answers.

4         First, relators have speculated that in the next

5    contracting cycle, a private health insurer will bid more to

6    take care of Medicare beneficiaries, and the Government will

7    accept that bid and somehow us not -- our client's not

8    reporting Medicare liability today will affect that future

9    unaccepted contract bid that hasn't yet happened.

10        Even if that daisy chain of speculation about what

11   might happen in the future comes to pass, there is still no

12   existing obligation that has been avoided today.  And that's

13   what the statute requires.

14        Relators are just speculating about some hypothetical

15   harm in the future, which kind of harm is not addressed by the

16   False Claims Act.  They have to show an existing obligation to

17   write a check today, that was impacted or reduced as a result

18   of the conduct they're complaining about.

19        The other thing they suggest for the first time in

20   their opposition brief is that the Government has discretion

21   to impose a $1,000 fine for each instance of not reporting.

22   So that is why they say the defendant insurers don't report.

23   I've been trying to wrap my head around that argument for two

24   days, and I don't understand.

25        If the Government has a $1,000 fine for not

```
 1    reporting, why would defendants not report?  It just doesn't
 2    make sense.  But putting that aside, there is actually a fine
 3    for not reporting, and we explain the actual current statutory
 4    and regulatory scheme in our reply brief at ECF 390, page ID,
 5    4684.  So they're simply wrong.
 6         But let's just say they're right for a second.  And
 7    there was a fine that the Government had the option to impose
 8    as its discretion, I'll refer the Court to footnote four of
 9    the Sixth Circuit's decision in Maur, M-a-u-r, which explains
10    why a contingent fine isn't an obligation within the meaning
11    of the False Claims Act.
12         In the words of the Fifth Circuit in the Simoneaux
13    case, S-i-m-o-n-e-a-u-x, 843 F.3d 1033, it is, quote, "Widely
14    accepted holding that contingent penalties are not
15    obligations."  End quote.
16         So lastly, to put a sheen of sort of law on their
17    theories, the plaintiffs argue that they have something called
18    an indirect reverse false claim, whatever that is, and rely on
19    a case called U.S. versus Caremark, a Fifth Circuit case from
20    2011.
21         The statute, of course, says nothing about indirect
22    reverse false claims.  And Caremark, in the indirect false
23    claim theory does not appear to ever have been applied
24    anywhere in the Sixth Circuit.  But taken on its face, it
25    wouldn't apply in this circumstance.
```

```
 1              In Caremark, a pharmacy benefit manager defrauded the
 2    State Medicaid agencies, one government, knowing that the
 3    state's obligation to the Feds, another government, would be
 4    impaired.  It has nothing to do with this case.  I haven't
 5    been able to figure out the analogy.  And just sticking a
 6    label of indirect false claims on it doesn't make it --
 7    doesn't make it so.
 8              I'm going to -- I'm going to refer the Court, frankly
 9    to our discussion of our exemplars.  There's no obligation at
10    all in this case, and the plaintiffs have not come up with
11    one, let alone one pled with particularity that's been
12    avoided.
13              I need to just deal, before I sit down, with two
14    things.  With the conspiracy claim first, I mentioned U.S. v.
15    Walmart in my discussion of public disclosure bar, which says
16    that conspiracy is derivative of the primary claim.  There
17    can't be liability for conspiracy when there's no underlying
18    violation.
19              The District Court in U.S. ex rel. Holbrook,
20    H-o-l-b-r-o-o-k, 336 F.3rd at 873 from the Southern District
21    of Ohio said that crystal clear.  And that's why I cite that
22    case.
23              Conspiracy claims can't rescue deficient primary
24    claims.  The failure to plead a primary violation of the Act
25    dooms the entire complaint.  But even on its own, the
```

```
 1    conspiracy claim fail.
 2            There is no agreement to violate the Act or an overt
 3    act in furtherance of an unlawful agreement pled anywhere in
 4    the complaint, nowhere, let alone one with particularity.  The
 5    who, what, when, where, why of this alleged agreement among
 6    317 defendants, I couldn't find it anywhere in the complaint.
 7    So I took a look at the section of their brief, the relators'
 8    brief in which they purport to justify their conspiracy claim,
 9    which is pages 45 to 47 of ECF 376, page ID 3940.  There is
10    literally nothing there.  Not a peep about the particular
11    circumstances of an agreement, not a peep about understanding,
12    or anything that could support a conspiracy claim.
13            Plaintiffs want the Court to infer a conspiracy, but
14    Iqbal Twombly and Rule 9(b) require such an inference to be
15    based on plause -- to be plausible and actually based on the
16    facts alleged.  There is no fact -- I understand the rhetoric,
17    but there is no fact alleged from which the Court can make a
18    plausible inference that 317, or even two defendants conspired
19    to violate the Act.  There's no plausible reason to even offer
20    why defendants would enter into such a conspiracy, not even --
21    or facts showing that they did.
22            And as for the overt act in furtherance of this
23    nonexistent agreement, there's one thing cited.  The complaint
24    cites the revision of a non-party's contract with Defendant
25    ISO.  There's no allegation that ISO breached the contract.
```

```
 1    There is no allegation that defendants were involved in that.
 2    There's no fact pled anywhere, that has anything to do with
 3    anybody other than the usual business arrangement.  There
 4    simply isn't an overt act.
 5            And lastly, if it's not obvious, Your Honor, Count
 6    Three of the complaint deals with state law claims.  And I
 7    think the easiest way to address them is just not to deal with
 8    them, and decline to exercise supplemental jurisdiction once
 9    Your Honor chooses to dismiss Counts One and Two.
10            If Your Honor decides to get into them, you'll find
11    that the causes of actions purportedly asserted under most of
12    the state claims don't even exist.  And relators, in most
13    instances, don't have the right to bring them.  They have to
14    be brought by a local law enforcement official, if at all.
15            So with that, I will sit down.  And thank Your Honor
16    for your indulgence in allowing me to speak to these issues.
17    I hope I won't have to, but I'd like to reserve just a few
18    minutes to respond to anything my colleagues say.
19            Thank you.
20            THE COURT:  Okay.  Thank you.
21            Okay.  Who is -- are you going to respond now?  Who's
22    responding first?
23            MR. ARMAS:  Judge, I am.  Judge, may I have a
24    personal break, please?
25            THE COURT:  Sure.  How long do you need?
```

1          MR. ARMAS:  Five minutes.

2          THE COURT:  Okay.  Let's take a five-minute break.

3          MR. ARMAS:  Thank you, Judge.

4          CASE MANAGER:  All rise.

5          We're in recess.  You may be seated.  We will start

6   in five minutes.

7      (Recess taken from 2:58 p.m. to 3:04 p.m.)

8          CASE MANAGER:  All rise.

9          Court is now back in session.  You may be seated.

10         THE COURT:  Okay.  I'm ready to begin again.

11         MR. FRIEDMAN:  Good afternoon, Judge.  And, thank

12   you.

13         THE COURT:  You're welcome.

14         MR. ARMAS:  Again, I am Alfredo Armas, and I

15   represent the co-relators.  Judge, a lot of this argument has

16   been done in a -- in a vacuum.  And I think it's important

17   that we get the full context of what it is that we are

18   addressing in this case.

19         Medicare existed and was acting, not as a health

20   insurance company, but as a payer as a matter of policy.  And

21   that led relatively quickly to the bankruptcy of the Medicare

22   Trust Fund.

23         Jimmy Carter appointed a gentleman named Joe Califano

24   as director of HEW.  It was Health Education and Welfare at

25   that time.  And Mr. Califano was disconcerted that all other

 1   health insurance companies in the United States were able to
 2   coordinate benefits and were able to subrogate, and were able
 3   to seek monies from other insurance companies, for example,
 4   that insured premises where a slip and fall occurred, insured
 5   automobiles, and provided no-fault insurance.

 6          Mr. Califano created what was then known as HCFA in
 7   the Carter Administration, and what we know today as CMS or
 8   the Centers for Medicare and Medicare Services.  And
 9   Mr. Califano attempted to subrogate Medicare claims, and seek
10   reimbursement from insurance companies.  At that time,
11   presidents acted through Congress, and not so much through
12   excessive order.

13          And finally, in 1980, the following year, Congress
14   passed the Medicare Secondary Payer Act.  And what the
15   Medicare Secondary Payer Act says beyond doubt or impaired
16   venture, is that Medicare will be the payer of last resort.
17   And before Medicare has to expend one penny on the healthcare
18   of its enrollees, the insurance company that are reliable for
19   the injury or that have caused the need for medical care have
20   to step up and pay for those services.  There's no dispute on
21   that.

22          And we are dealing with insurance companies that
23   provide automobile coverage, that provide no-fault, that
24   provide slip-and-fall coverage, et cetera.  So that should
25   have been the solution to this problem of Medicare losing

 1    billions of dollars and putting the Medicare Trust Fund in

 2    peril.  And, of course, insurance companies being insurance

 3    companies, that's not what happened at all.

 4         And what Congress discovered after the implementation

 5    of the Medicare Secondary Payer Act, is that the insurance

 6    companies weren't paying.  Not only were they not paying, they

 7    were concealing their liability.  When they were obligated to

 8    pay, they wouldn't come forward.  And there was really no

 9    mechanism for CMS or HCFA to determine when it could seek

10    reimbursement.

11         And the reason there's reimbursement, there's a

12    little twist to the Medicare Secondary -- Secondary Payer Act.

13    And that is, the Government doesn't want to impact healthcare

14    providers.  So healthcare providers shouldn't have to wait for

15    the dust to clear, and for a determination to be made as to

16    who is the primary payer.  So most of the time, the Government

17    will go ahead and pay primary care physicians, will go ahead

18    and pay hospitals under Medicare parts A and B, and then

19    expect to get reimbursed.

20         So it's either the primary care -- the primary payers

21    have to pay initially, or the primary payers have to reimburse

22    CMS.  None of that was happening.  None of it.

23         So Congress came up with Section 111 requirements.

24    And we have a timeline here, Judge.  And it shows that this

25    ravine has --

```
 1              THE COURT:  Counsel, excuse me, do you have a small
 2    -- a paper copy of that?
 3              MR. ARMAS:  Yes, we do.
 4              THE COURT:  Yeah, that would be good.  That would be
 5    nice.  Thank you.
 6              That's pretty small, too, huh?
 7              MR. ARMAS:  Yes.  Yes, Judge, I --
 8              THE COURT:  No, it's not.  I can see.
 9              MR. ARMAS:  I complained to my young colleagues.
10              THE COURT:  It needs to be big.
11              Okay.  All right.  Go ahead, though.
12              MR. ARMAS:  It does.
13              Judge, in order to remedy this ongoing problem,
14    Congress enacted the --
15              THE COURT:  Now, wait a minute, which ongoing
16    problem?  The problem, the subject of the case, or the chart?
17              MR. ARMAS:  The problem with Medicare not getting
18    reimbursed.
19              THE COURT:  Okay.  That was intended to be a
20    lighthearted remark.
21              Okay.  Go ahead.
22              Tell me about what you were pointing out on the
23    timeline.
24              MR. ARMAS:  Judge, it's the very first slide.
25              THE COURT:  Okay.
```

 1          MR. ARMAS:  And it says December 29, 2007.

 2          THE COURT:  Okay.

 3          MR. ARMAS:  And that's when the Section 111 reporting

 4   requirements came into effect.  And the Section 111 reporting

 5   requirements are very simple.  It says, listen, insurance

 6   company, when you are primarily liable because it is a

 7   no-fault situation, or because you have insured a motorist

 8   that has injured a third party, and you are liable for

 9   healthcare, you need to step forward and you need to notify

10   CMS or then HCFA, now CMS, that that is the case.

11          So for us, the problem is solved.  Now, we have the

12   Medicare Secondary Payer Act.  Before, the Government had no

13   way of knowing when the primaries were liable.  So now, there

14   is the Section 111 reporting requirement.  And Judge, nothing

15   happened.  Absolutely nothing happened.  Why?  Because the

16   insurance companies are incorrigible, and they weren't

17   reporting under Section 111.

18          They simply weren't advising CMS.  And how do we know

19   that?  Let me tell you what MSP is, because a lot has been

20   done in the moving papers to denigrate MSP.  And Judge, I will

21   tell you, MSP has taken on these insurance companies.  And

22   yes, it was a nascent model at one point.  Mistakes were made.

23   It has been perfected.  And I believe that MSP has had a clear

24   run of exceptional success in the -- in the United States

25   Circuit Courts of Appeal, and we cited those cases to the --

 1    to the Court.

 2            Judge, one in particular, because it -- it really

 3    addresses arguments that were presented here today.  Judge

 4    John Walker is a sitting judge in the Second Circuit United

 5    States Court of Appeals, and he was on loan to the Eleventh

 6    Circuit when ACE was decided.  And this is what he said.  And

 7    it is precisely what MSP is addressing.

 8            The primaries are not paying primary, they're

 9    waiting.  And they -- and the secondaries pay and make the

10    payment, and then the primaries are not stepping up after

11    those payments are made to reimburse.  They are waiting.  And

12    they're, obviously, from an economics' perspective, to their

13    advantage to do that, to put it off as long as possible and

14    have the lawsuits come in as limited a way as possible.  And

15    that's why your client -- what your client is doing is

16    problematic from their perspective because it aggregates these

17    claims and goes after them after the primary reimbursements

18    and must, if you will.

19            And then it goes on to say, if the primaries come in

20    and pay, then the taxpayers are relieved of this risk to the

21    extent of the primaries' obligation.

22            Judge, I will tell you that in ACE, the Eleventh

23    Circuit Court of appeals requested that Health and Human

24    Services, the successor to HEW, weigh in on these cases.  And

25    Health and Human Services came in and filed a brief.  And this

 1    is what they said.

 2              The purpose of those provisions is to protect the

 3    fiscal integrity of the Medicare program by ensuring that

 4    Medicare will not be required to pay for items or services for

 5    which a primary plan should be responsible.  While payments do

 6    not go to the Medicare directly, in Medicare advantage cases,

 7    payment by primary payers reduces costs, and some of those

 8    savings are passed on to Medicare through reduced costs, or to

 9    the beneficiaries through expanded services.

10              Why have I said that?  It has been argued from the

11    lectern that we are not presenting -- that these relators are

12    not presenting a quorum to the United States Government.  In

13    fact -- and point of fact, Judge, we are.

14              First, we are alleging an indirect false claim.  And

15    what does that mean?  An indirect false claim is nothing more

16    than your typical fraudulent tax return.  You have an

17    obligation to the United States Government.  You utter a paper

18    that conceals or lowers that -- that liability, that is a

19    reverse false claim.  And that's what they do every time they

20    fail to report their Section 111 obligations, primary payer

21    obligations.

22              But in addition, Judge, and I want the Court to be

23    very clear on this, there are different kinds of Medicare.

24    There is Medicare's parts A and B, and that is where the

25    Government directly pays for an enrollee's healthcare.  And

1    then, there is Medicare part C.  And part C is a traditional

2    HMO type of program where a health insurer will be obligated

3    to provide all of the medical care that is otherwise provided

4    by the Government in exchange for a capitated per member, per

5    month payment from the United States Government.

6         So in this case, we are alleging both.  We are

7    alleging, number one, these insurance companies are defrauding

8    the United States Government, but -- by not reporting their

9    Section 111 primary payer obligations through ISO.  They all

10   use ISO as a depository of their data, and that data doesn't

11   get transmitted to the United States Government as Section 111

12   reporting as it should.

13        And number two, because they don't reimburse the

14   Medicare part C as well, they are also impacting the Medicare

15   Trust Fund.  And that's what Health and Human Services said

16   when they said, while payments do not go to Medicare directly

17   in Medicare advantage cases, payment by primary payers reduces

18   costs, and some of those savings are passed on to Medicare

19   through reduced costs or to the beneficiaries through expanded

20   services.

21        What that means, Judge, is that when these insurance

22   companies, HMOs, think of United Health and Humana, when they

23   negotiate with the Government, they negotiate based on the

24   prior years' experiences.  So if the prior years' expenses

25   were higher, and the reimbursement to these insurers -- to

```
 1    these healthcare plans was less because the primary payers
 2    weren't paying, then the Government is impacted, of course,
 3    because the contracts will be higher.  So we have both of
 4    those claims.
 5            Judge, the Court in ACE went further.  And in
 6    agreeing with MSP on all issues, the ACE court went on to
 7    define when primary payers like these defendants have
 8    constrictive knowledge that they owe reimbursements.  And that
 9    is the filings with Health and Human Services and, of course,
10    when it is a no-fault coverage PIP, they are on notice
11    immediately that they have to provide the -- the cost of the
12    medical services.
13            Judge, I would ask the Court to please review MSP A
14    claims versus Tenant.  It is cited at 918 F.3d 1312.  It's a
15    2019 case in the Eleventh Circuit.
16            THE COURT:  Give the citation again.
17            MR. ARMAS:  Yes.  918 F.3d, 1312.
18            THE COURT:  Thank you.
19            MR. ARMAS:  Eleventh Circuit.
20            There is MSP v ACE, where Judge Walker sat on the
21    Eleventh Circuit that I just cited to, and that's at 974 F.3rd
22    1305; MSP versus Kingsway, and that is at 950 F.3d 764.
23            Judge, in short, far from -- from being a meddler,
24    MSP Recovery has, in fact, demonstrated its ability to bring
25    these insurance companies to task.
```

1              Let me explain what MSP does.  And Your Honor will

2       see why MSP is not only the original source of this

3       information to the Government, but it is the only possible

4       source of -- of this massive fraud that is being perpetrated

5       on the United States Government.

6              MSP has a database of approximately 40 million lives.

7       And this is what happens.  When a health plan like Humana or

8       United Health has an enrollee that is injured, and the injury

9       is the result of trauma as opposed to chronic illness or -- or

10      disease, then that plan creates what is called an encounter.

11      And they will treat the -- the enrollee as a patient, provide

12      primary care or hospital care, as the case may be.  And they

13      will determine from the enrollee that the injury was a result

14      of a car accident or as a result of a dog bite or as a result

15      of a slip and fall and an encounter is created.

16             When MSP obtains that data from these healthcare

17      providers and healthcare plans, it then bumps up the data

18      against accident reports, against ambulance services.  And in

19      those accident reports, the peace officer that -- that wrote

20      up the report will invariably say who insured whom in the --

21      in the accident.

22             So now, MSP, as it bumps up this data using its

23      proprietary software, has determined that there was healthcare

24      provided by a Medicare plan to a Medicare enrollee.  And now

25      that that -- those medical services were provided as a result

1     of trauma, either an accident or a dog bite, a battery, and
2     that there is primary insurance coverage.

3           So now that we have that data, MSP then goes to
4     another service, which has all of the data of reports.  It
5     doesn't have the actual reports.  Only ISO has that, and the
6     -- and the insurance primary care -- primary plans themselves.
7     But this system called Ability has all of that data of all of
8     the reporting.

9           So what MSP has done in this case, is gotten the data
10    from these health plans and health care providers, that
11    services and goods have been expended by these plans to
12    provide medical care to a Medicare enrollee who was injured as
13    a result of an accident, where one of these insurance defense
14    companies was a primary payer.  And then, they have taken that
15    data and bumped it up with the Section 111 reports.

16          And of course, if the law is being followed and
17    Congress' mandates were to be effective, we wouldn't expect
18    that in virtually all of the cases where that scenario
19    occurred, where Medicare enrollee has been injured as a result
20    of the negligence or the -- the PIP coverage covered by one of
21    these insurance defendants, then we would expect a Section 111
22    report to be identified by -- by the Ability data.

23          And in fact, what happens, Judge -- what happened is
24    that we took to the Government before filing.  And this is
25    actually attached to the body of the complaint --

 1            THE COURT:  Okay.

 2            MR. ARMAS:  -- itself.

 3            And what we discovered, for example, State Farm, we

 4    looked at approximately 32,000 examples.  And this is not the

 5    entire universe.

 6            Remember, we have data of approximately 40 million

 7    lives.  But we bumped up 32,000; 33,000 discrete cases where

 8    Medicare services were rendered to a Medicare enrollee and

 9    paid for by a Medicare plan, where State Farm was the primary

10    payer.  And what happened is that we discovered that seventy

11    -- 7,500 of those 33,000 events were reported to CMS using

12    Section 111 reports, and a whopping 27,000 cases were not

13    reported.

14            And the same thing happened with the Berkshire

15    Hathaway Group, the Progressive Group, Nationwide, Liberty

16    Mutual, Travelers, and all -- and so on down the list, every

17    single time that we bumped up this data, we returned

18    algorithmic evidence that these insurance defendants were not

19    reporting to -- their Section 111 requirements to the United

20    States Government.

21            If they do not report -- because this is the only way

22    that we can get reimbursement or payment.  And by we, I mean

23    the Medicare plans and Medicare itself.  This is for Medicare.

24    The only way that a recovery is affected is through the

25    Section 111 reporting.

```
 1          So we know, or certainly it is not an improper -- an
 2   improbable leap of logic to assume that those monies have not
 3   been recovered.  It's -- it's the same, Judge, as if I had
 4   income and I didn't report it to the IRS.  And that is a
 5   reverse false claim under the statute.  And that is what MSP
 6   brings to bear.
 7          Judge, I want to address these two supposed public
 8   disclosures.  One is Takemoto, the other one is Hayes.  And
 9   this is -- this is what the motion to dismiss alleges Hayes
10   said.  And this is at page 51 in the motion to dismiss, Judge.
11          And these defendants say with respect to Section 111
12   reporting.  Remember, Judge, the gravamen of our complaint is
13   that these insurance defense -- defendants are not reporting
14   their primary obligations pursuant to Section 111.  That is
15   what we are alleging.
16          This is what they say Hayes alleged.  With respect to
17   Section 111 reporting, Hayes alleged that the insurers were --
18   and they quote, "Required to determine whether a claimant was
19   entitled to Medicare benefits, and provide the claimant's
20   identity and other information needed to ultimately ensure
21   reimbursement, but failed to do so."  And they said -- and
22   they cite the Hayes complaint at paragraph 375 and 376.
23          So they are telling this Court that Mr. Hayes alleged
24   Section 111 reporting was -- was ignored by these insurance
25   companies.
```

1          Let me tell you what Mr. Hayes actually says in his

2     complaint that they are proffering up as having the same, or

3     substantially the same allegations.  This is Mr. Hayes

4     speaking for himself.

5          This supplement to the Ship Act, and incidentally,

6     Judge, this is Section 111, the supplement to the Ship Act,

7     though delayed in its enactment, has apparently raised the

8     consciousness of liability insurers generally, such that there

9     appears to be more compliance with Medicare reimbursement than

10    during the time periods cited herein when there was

11    essentially complete avoidance.

12         So Mr. Hayes is saying, listen, I am making

13    allegations of noncompliance by primary payers, but it appears

14    from my temporal point of view today, that the insurance

15    companies are bringing -- are getting their act together.  He

16    goes on.  Despite however, the appearances of increased

17    compliance, all the defendant insurers are expanding their

18    indemnification phraseology and general releases.

19         And I'll get to that in a second.

20         The defendants still seek to protect their interest,

21    avoiding their obligation of ensuring repayment by co-opting

22    and intimidating claimants and their attorneys with ever

23    broadening indemnifications qualities.

24         And here's the key.  At paragraph 379, this is what

25    Mr. Hayes says.  The above cited section, relative to the

1   failure to report, is entirely distinct and totally

2   independent of the MSP sections and responsibilities to

3   reimburse and repay under which this suit is brought.

4          Mr. Hayes, himself, is saying, yes, now -- and at

5   that time, at that point in time, Section 111 still had not

6   been implemented.  Implementation doesn't occur until 2011 and

7   2012 depending on whether it's -- it's PIP coverage or a

8   third-party liability.  When Mr. Hayes is making these

9   allegations and his very last release, that's what he was

10  complaining in his very last release, that's what he was

11  complaining about, is 2010.  But he is almost speaking to the

12  insurance defendants and saying, no, no, no, that's not what

13  my case is at all.  And he says, the above cited section

14  relative to the failure to report -- there's no question that

15  he's referencing Section 111 -- is entirely distinct and

16  totally independent of the MSP sections and responsibilities

17  to reimburse and repay under which this suit is brought.

18         He's saying it has nothing to do with my suit.

19  Section 111 has nothing to do with my suit.  And, of course,

20  Section 111 is exactly what our lawsuit is.

21         Similarly, Takemoto, Judge.  And this is another case

22  that is proffered as a public disclosure bar because the --

23  the claims were substantially the same.

24         And what happened with Mr. Takemoto is that

25  Mr. Takemoto was soliciting the insurance industry for him to

1    act as an outsource compliance officer, and he had these

2    seminars.  And in these seminars, he would pitch himself and

3    his company as an outsource compliance officer to ensure

4    compliance with CMS.  At that time of which he speaks, Section

5    111 had not been implemented.  And this is what he says.

6          Takemoto alleged that he approached Allstate to pitch

7    reporting to Medicare as required by the impending MMSEA 111

8    legislation.  And that's at paragraph 93 of Mr. Takemoto's

9    complaint.

10         So Mr. Takemoto is talking about a regulation that is

11   going to come into effect in the future.  He cannot possibly

12   be claiming that the insurance industry is not compliant with

13   Section 111.  One, because it still hasn't been implemented;

14   and two, because he cannot be predictive if he is going to

15   bring a claim.

16         Which brings me back to another allegation that --

17   another argument that was made, that we don't have standing

18   because these allegations are really allegations that belong

19   to private parties.

20         And Judge, I will direct you to Judge Murphy because

21   he really dove into this issue of standing.  And he states in

22   his memorandum order, what is more, the relators establish

23   three standing elements.  Relator MSP WB allegedly has direct

24   knowledge of tens of thousands of instances wherein the

25   defendant failed to report their primary payer responsibility,

1    causing government health programs to reimburse for the

2    beneficiary's accident -- accident-related medical expenses.

3            And he cites ECF 41.

4            And the relators claim that the defendants

5    systematically failed to completely or adequately satisfy

6    Section 111's reporting requirements.  That's exactly correct.

7            Taken as true, relators established a fraud inquiry

8    on the United States due to Defendant's failure to satisfy

9    Section 111's reporting requirement.  One relator even has

10   direct knowledge of the defendant's reporting failures, and

11   can trace defendants to the alleged fraud.  And a favorable

12   decision would likely redress the alleged fraud injury.

13   Because the relators have standing, the Court will deny the

14   defendant's motion in regard to standing.

15           Judge, I am -- I am reading from Judge Murphy because

16   it, in a very concise manner, sets out exactly what these

17   relators are alleging.  And it's not an injury to private

18   parties.  It is a massive fraud that is being perpetrated upon

19   the United States.

20           Judge, I want to address a little bit of the public

21   disclosure bar.

22           A lot of authority is cited by the defendants that

23   completely ignores the amendments that have been made.  And I

24   will tell Your Honor that one of the most important of these

25   amendments is contained in the Affordable Care Act.

```
 1              And this is what the new public disclosure bar says.
 2    First of all, it has taken out a -- a jurisdictional issue,
 3    which is very important for this case, Judge, because
 4    previously, if a public disclosure barred the action, then the
 5    Court was without jurisdiction.  The Court had to dismiss the
 6    action, and the judicial labor was ended.  That is no longer
 7    the case.
 8              Every circuit that addresses has said the Affordable
 9    Care Act has amended the statute, so that now this is either a
10    motion to dismiss with leave to amend, or it is subject to --
11    it is an affirmative defense, which should be pleaded.
12              Judge, I would ask at this time, and let the Court
13    know that this is the first time, this is a first amended
14    complaint, and this is the first motion to dismiss that
15    addresses it.  If Your Honor finds any deficiencies, and I
16    don't believe that there are any -- and Judge, please, we -- I
17    implore the Court to ignore the allegations as to what MSP has
18    -- has done and failed to do, and looking at the exemplars,
19    and really concentrate on this lack of reporting.  Because
20    ultimately, that is the obligation that the insurance
21    defendants have, and that is the obligation that they are
22    assuring.
23              Beyond it being no longer a jurisdictional hurdle,
24    the statute has been amended, and now reads as follows:
25              The Court shall dismiss an action or claim under this
```

1   section unless opposed by the Government, if substantially the

2   same allegations or transactions were publicly disclosed in a

3   federal, criminal, or administrative hearing in which the

4   Government or its agent is a party.

5         And Judge, what they're alleging -- what they are

6   alleging is, (A), that even though the United States

7   Government declined intervention in Hayes and Takemoto, that

8   Hayes and Takemoto are agents of the Federal Government, and

9   that Hayes and Takemoto, which have nothing whatever to do

10  with Section 111 reporting, somehow contain substantially the

11  same allegations or transactions as alleged in the action.

12        There is now, a safety net for relators, which wasn't

13  there before.  And that safety net is the original source

14  provision of the new Affordable Care Act, False Claims Act.

15  And it says, here's an exception.  The exception is, if you

16  are an original source of the information who has knowledge

17  that is independent of, and materially adds to the publicly

18  disclosed allegations or transactions.

19        So it is an original source who has knowledge that is

20  independent of, and materially adds to the publicly disclosed

21  allegations.

22        Now, the Sixth Circuit has said, these are

23  significant changes.  This is not nothing.

24        The Court in Holloway, and that's cited at 960 F.3rd

25  836, the Sixth Circuit United States Court of Appeals states,

1     from a textural standpoint, substantially the same, facially

2     demands a greater degree of similarity between the qui tam

3     complaint and the prior disclosures than based upon.  Based

4     upon was the prior standard.

5          And substantially the same, undoubtedly, is more

6     rigorous than even partly based upon, as we have interpreted

7     based upon to mean.

8          Court said, having held that Holloway's claims do not

9     survive pre-amendment public disclosure, we must decide

10    whether they surmount the more lenient post-amendment public

11    disclosure bar.

12         At the same time, we continue to be guided by the

13    statute's general purpose of encouraging genuine whistleblower

14    actions while snuffing out parasitic suits.

15         Judge, again, I implore Your Honor to look at

16    Holloway.  And in Holloway, something very interesting

17    happens.  In Holloway, the Court, after defining and saying

18    this change is significant, it's not nothing, goes on and

19    says, you know, this sounds like it's an original source

20    argument, but unfortunately, the -- the defendant has not --

21    the relator has not made that argument.  Had the relator made

22    that argument, we may very well have considered it.

23         We are making that argument, Judge, that we are an

24    original source.  And what an original source means in this

25    case, is that we have brought to bear, years of litigation,

1   discovery, deposition testimony, some of which is appended.

2   And with that deposition testimony in the other cases where we

3   have taken depositions, shows -- is that there's a reason.

4   There's a reason why we have this extraordinary gap between

5   reported and unreported. And that is, because these insurance

6   defendants willfully refused to obtain the information that

7   would disclose whether their insurers or those who their

8   insurers have injured are Medicare beneficiaries.

9       Judge, there is an appendix. Read those deposition

10  excerpts. They don't ask social security numbers. They don't

11  ask for -- for any identifiers that would be -- that would

12  show them to be Medicare beneficiaries. They purposely put

13  blinders on. They purposely put blinders on, don't obtain the

14  information. They don't report. They don't data to ISO.

15  ISO, as part of this massive fraud upon the Government does

16  not submit Section 111 reports properly.

17      And then, after we provide all of the data that we've

18  provided, using our own data for this, they come into court

19  and say, in effect, you know what, Judge, because we have so

20  successfully concealed our primary payer status, they don't

21  have the data to prove it. And the Sixth Circuit makes short

22  shrift of that sort of argument.

23      There is a case, it is called Prather. And there is

24  another one called Duke Energy. And, Judge, Duke Energy is

25  cited at 681 F.3d 803.

```
 1              I'm sorry, that's not the -- the citation.  It is
 2     cited at 681 F.3d 788.  And this is what the Court said.
 3              With respect to Defendant's 9(b) argument, this Court
 4     has held that it is a principle of basic fairness that a
 5     plaintiff should have an opportunity to flesh out her claim
 6     through evidence unturned in discovery.
 7              Rule 9(b) does not require a missing omniscience,
 8     rather the rule requires that the circumstances of the fraud
 9     be pled with enough specificity to put defendants on notice as
10     to the nature of the claim, especially in a case in which
11     there has been no discovery.  Courts have been reluctant to
12     dismiss the action where the facts underlying the claims are
13     within the defendant's control.
14              What happens here is that the facts are exclusively
15     under the defendant's control, except for such facts as we
16     have determined in other litigation where private parties are
17     plaintiffs, and other than where we would have been able to
18     bump up against ability, which is the massive information of
19     all liability, and using our accident reports, ambulance
20     reports, et cetera.
21              There is a -- a case that is remarkably similar.  It
22     is not from the Sixth Circuit.  But unlike the Court in
23     Holloway that never had an opportunity to look at the original
24     source doctrine, the Third Circuit in Majestic Blue Fisheries
25     did.  And Judge, I implore the Court to look at Majestic Blue
```

1    Fisheries more than anything because it is so similar to our

2    case.

3            In that case, you also had a relator that was an

4    attorney.  And you also have a situation where the attorney

5    obtained original source information through discovery in

6    prior litigation.  And the Court, unlike the Court in

7    Holloway, where it was foreclosed from determining whether the

8    relator was an original source or not because it wasn't

9    argued, this relator did argue it.  And the Third Circuit

10   found that they were original sources.

11           And one of the things that is argued by the

12   defendants, is that MSP WB doesn't have this knowledge.  All

13   of this knowledge was obtained by MSPR and related entities

14   and affiliates.  And that is true.  But under the new public

15   disclosure bar in the Affordable Care Act, that is absolutely

16   of no moment.  And that is because the original source was,

17   bring information that is new, not to the entire universe, but

18   new in comparison to what has been proffered as the public

19   disclosure bars.  In this case, Takemoto and Hayes.

20           So that all MSP WB has to say is, as far as Takemoto

21   and Hayes, those complaints, this is new.  These are new

22   allegations that we bring.  Whether or not I have obtained

23   them and I am the repository of the knowledge from my

24   affiliates, the MSP entities is absolutely of no moment.

25           And this is the Court in Majestic Blue Water.  What

 1    happened in Majestic Blue Water is that there is a treaty
 2    where the United States have determined that our fisheries are
 3    being poached by every nation in the world.  And this is
 4    especially true in the South Pacific.  So we have enacted laws
 5    that say, only United States' vessels, fishing vessels manned
 6    or operated by Americans can fish these waters.  And what the
 7    -- a group of Koreans was doing, is they were getting straw
 8    purchasers, vessels, being Americans, and they were getting a
 9    straw captain, an American, to be a captain on the boats when
10    in reality, the Koreans were in charge of the vessel and the
11    vessel was really owned by Korean companies.
12          And what happened is that one of the crew members
13    died on one of these voyages.  And the relator, being an
14    attorney, brought a lawsuit, a wrongful death action.  And in
15    the wrongful death action, he found out everything that I am
16    telling the Court.  And he took depositions where he was able
17    to elicit testimony that, in fact, the Koreans were acting
18    through straw purchasers and straw crews.  And then, he
19    brought a qui tam action against the owner of the vessel,
20    Majestic Blue.
21          And in the action, the defendant said, no, no, your
22    action is barred.  There's a public disclosure that predates
23    your lawsuit.  And that public disclosure is all over the
24    news.  And the Third Circuit looked at it and said, gee, yeah,
25    it is all over the news.  You are correct, Defendant.

 1          But you know what?  This relator, this attorney that
 2   has obtained this information independently of those news
 3   articles is an original source under the new Affordable Care
 4   Act version of the public disclosure bar.  And the Court said
 5   the following.
 6          But the PPACA's new definition of original source
 7   requires an entirely different analysis.  An original source
 8   is now defined as one who has knowledge that is independent
 9   of, and materially adds to, the publicly disclosed allegations
10   or transactions.  And that is bolded.  In our case, Takemoto
11   and Hayes.
12          This definition, therefore, states that a relator's
13   knowledge must be independent of, and materially add to, not
14   all of the information readily available in the public domain,
15   but rather only information revealed through a public
16   disclosure source in Section 3730.
17          And I cite that, and I emphasize it because the
18   defendant's argument is, because this information is really in
19   the hands of the MSP affiliates and not this relator, you are
20   not an original source.  And the Third Circuit really dives
21   into it and really parses the land and says, no, no.  The
22   information must only be independent of Hayes and Takemoto,
23   not also independent of its own affiliates' knowledge.
24          So, they fail there.
25          They -- the defendants make light of our reference to

 1    Walburn versus Lockheed Martin.  And indeed, in Walburn versus
 2    Lockheed, the Court -- and it is a Sixth Circuit case cited at
 3    431 F.3d 966.
 4          431 F.3d 966 was looking at the first-to-file bar in
 5    the -- the Affordable Care Act's version of the public
 6    disclosure bar.  There is a -- I'm sorry, of the False Claims
 7    Act.
 8          There is a first to file provision in the -- in the
 9    False Claims Act as well.  It is not the multi-district first
10    to file provision that we're familiar with.
11          And the Court, in addressing why a prior case was not
12    a first to file, said it's not because it doesn't -- that
13    case, that complaint didn't meet the 9(b) pleading
14    requirements.  And the Court says, a complaint that is
15    insufficient under Rule 9(b) is dismissed precisely because it
16    fails to provide adequate notice to the defendant of the fraud
17    it alleges.
18          A complaint that fails to provide adequate notice to
19    a defendant can hardly be said to have given the Government
20    notice of the essential facts of a fraudulent scheme, and
21    therefore, would not enable the Government to uncover related
22    frauds.  So the Court determined it's not a first to file.
23          Why do we rely on that case?  Why do we cite it?  We
24    cite it because in order for there to be a public disclosure
25    bar, the prior public disclosure must put the Government on

1   notice of the fraud.

2          So that Takemoto and Hayes must put the United States

3   Government on notice that the insurance defendants are going

4   to be scuffles once Section 111 is implemented, and they are

5   not going to comply with the Section 111 requirements.

6   Something that it absolutely does not do.

7          But in addition to that, Hayes and Takemoto were both

8   dismissed for failure to allege fraud with specificity.  And

9   it was more than that, Judge.  Mr. Hayes, who was a lawyer,

10  was actually admonished by the Court, and Rule 11 sanctions

11  were imposed upon him for bringing an action that had

12  absolutely no support on a first-hand basis.

13         So Hayes -- remember, Hayes is the gentleman that

14  says my case, this case has nothing to do with Section 111

15  reporting, he says it himself, also failed to allege 9(b) --

16  meet 9(b) standards, and his action was dismissed and

17  sanctions were imposed upon him.

18         The same thing happens to Takemoto.  The same thing

19  happens to Takemoto.  Takemoto's case was dismissed for a

20  failure to stay -- to meet the 9(b) standards.

21         And the Sixth Circuit in Walburn versus Lockheed says

22  a complainant that fails to provide adequate notice to a

23  defendant could hardly be said to have given the Government

24  the essential facts of a fraudulent scheme, and therefore,

25  would not enable the Government to uncover related fraud.

1          Judge, the insurance defendants also intend to make

2     sure to make a short shrift of our allegations.  Our

3     allegations go into detail.

4          The reason we submitted Metropolitan from the

5     Eleventh Circuit United States Court of Appeals to have

6     supplemental authority is because that court was dealing with

7     exactly this sort of evidence.  Instead of individual

8     exemplars, we were looking at statistical samples.  And the

9     court said, you know what, that is sufficient to allege a

10    plausible claim.

11         These are the allegations that we have made.  We

12    allege a willful failure to correct inaccurate reporting, even

13    after specific notice from relators.

14         Defendants have failed and refused to report and

15    reimburse for a specific past conditional payment, even after

16    data matching with MSP, the defendants still failed to report

17    their primary payer status.  And that's an allegation made at

18    paragraphs 5 and 472.

19         One of the things that happened here, and I explained

20    to Your Honor how the Ability reports and that massive data

21    dump works.  It merely tells us whether, in fact, a primary

22    payer has reported liability allegations or not.  That's all

23    it tells us.

24         But before that, we had, as a client, as a paying

25    customer of ISO, we had access to ISO's data to determine the

1    extent of noncompliance with the insurance industry.

2            And amazingly, Judge, under pressure from the

3    insurance industry, ISO barred us, particularly, to the data

4    even though we were paying customers like everybody else.  And

5    then, they amended their rules of engagement.  So that in

6    order to become a customer of ISO, you have to admit that you

7    are not a collection agency, that you are not looking for

8    fraud, that you are not an attorney bringing class actions,

9    that you are not sifting through the data to determine

10   compliance or noncompliance with the Medicare Secondary Payer

11   Act.  And, we were debarred.

12           So that again, there is this massive wall that

13   prevents MSP, the relator, and it prevents the United States

14   Government from looking at the raw data.  And the only access

15   that anybody has is what ISO desires, or ISO wants the world

16   to see under its Section 111 reports.

17           We also alleged purposeful changing of ISO terms to

18   use -- to prevent MSPA recovery efforts.  And that allegation

19   that I just explained is made at paragraphs 496 through 497.

20           Willful failure to report.  And we have ten

21   exemplars.  We also make the allegations at paragraphs 527

22   through 537.  We have appendices.  And Judge, we have given

23   the Court the raw data.

24           Incidentally, Judge, all this information was

25   provided by Mr. Akeel to the United States Government before

1    the filing of the action.  I don't believe there's any dispute

2    as to that.

3            Willful failure to report and reimburse.  Failure to

4    report or report properly.  In tens of thousands of instances,

5    defendants have failed and refused to report thousands of

6    instances of primary payer status, as determined from the

7    later MSP's independent data analysis of its non-proprietary

8    claims data.

9            Allegations are made at paragraphs 27, 34, 50, 84,

10   91, 139, 176, 203, 227, 258, 296, 307, and 351.

11           That's paragraphs 27, 34, 50, 84, 91, 139, 176, 203,

12   227, 258, 296, 307, and 351, and the chart, which is also

13   incorporated into the first -- into the bottom of the first

14   amended complaint.

15           And that they have left critical information out,

16   what I alluded to earlier, Judge.  When they take these

17   critical applications, they don't ask, are you a Medicare

18   beneficiary.  They don't ask for social security numbers.

19   They don't gather the information that would provide -- that

20   would disclose that they are beneficiaries.

21           Now, they have a second opportunity when an accident

22   actually occurs and an adjuster is sent out to adjust the

23   claim.  And there's a boatload of questions that these

24   adjusters ask.

25           Was there an injury?  Was there a laceration?  Who

1    was at fault?  What were the conditions?  Were you wearing

2    glasses?  Was the driver wearing glasses?  Was alcohol

3    involved?  Et cetera, et cetera.  And none of these questions,

4    none of them have anything to do with Medicare eligibility.

5    They put blinders on purposely.

6            And Judge, the Sixth Circuit has basically said, we

7    -- you cannot put blinders on, and then plead lack of

8    specificity.

9            Conair versus J.C. Leasing, 921 F.2d 276.  921 F.2d

10   276.  It's a Sixth Circuit case, 1990, by conveying all of its

11   interest in the terminal facility, the defendant divested

12   itself of the ability to perform its obligations under the

13   covenant not to compete.  This amounts to a breach of the

14   purchase agreement by repudiation.

15           The FDIC's obligation to comply with the agreement

16   necessarily encompasses the obligation not to voluntarily

17   disable itself from complying with it.  And that's City Bank

18   versus FDIC 857976.

19           And what they do, and we have alleged, is that most

20   of these insurance companies sloth off this responsibility to

21   ISO so that they want to argue that, listen, we're not the

22   ones that perform -- that -- that comply with our Section 111

23   reporting requirements.  That's on ISO.

24           ISO is alleged, in this complaint, to be the very --

25   the very center of this conspiracy to defraud the United

1    States Government.

2           Judge, if I -- if I could have two seconds to consult

3    with my --

4           THE COURT:  Sure, you may.

5           MR. ARMAS:  -- co-counsel.

6           THE COURT:  Yes.

7           MR. ARMAS:  Judge, we want to make the Court aware,

8    there is a case Harper, H-a-r-p-e-r, versus Muskingum, and

9    it's a Sixth Circuit case.  And we are alluding to it,

10   reciting to it, Judge, because the argument was advanced by a

11   -- by the insurance defendants, that you cannot have a

12   contingent claim, that the claim must be formed fully.  And

13   we're saying that's not our claim.  Our claim is a failure to

14   report is a reverse false claim.

15          And indeed, there are -- there is a possibility of

16   unliquidated and contingent claims to come within the False

17   Claims Act.  And the cite is 842 F.3d 430, Sixth Circuit,

18   2016.

19          THE COURT:  Give it again.

20          MR. ARMAS:  842 F.3d 430, Sixth Circuit, 2016.

21          And the spelling of Muskingum is.  And the spelling

22   of Muskingum is M-u-s-k-i-n-g-u-m, Watershed Conservancy.

23          THE COURT:  Okay.  Thank you.

24          MR. ARMAS:  Thank you, Your Honor, for indulging us.

25   We do appreciate it.

```
 1              THE COURT:  All right.
 2              MR. ARMAS:  And I appreciate your concern for our
 3    safety as well, Judge, on the masks.
 4              Thank you.
 5              THE COURT:  Thank you.
 6              MR. FRIEDMAN:  Your Honor, in terms of scheduling and
 7    things to come, I would like -- sorry, for the record, it's
 8    Bryce Friedman for the defendants.
 9              I would like just five minutes, or a short amount of
10    time to respond to some of the things the relators said.  On
11    our side, I believe we only have one other attorney who wishes
12    to speak for a short period of time, no more than five to ten
13    minutes, on State Farm's specific issues.
14              So I'm happy -- I'm happy to reply briefly now, or
15    otherwise operate at Your Honor's pleasure.
16              THE COURT:  Okay.  So tell me who's going to speak
17    for State Farm.
18              Will that be Douglas Baruch?
19              MR. BARUCH:  Yes, Your Honor.
20              THE COURT:  Okay.  So Ms. Newton and Mr. Folland are
21    not going to argue?
22              MS. NEWTON:  That's correct, Your Honor.
23              MR. FOLLAND:  That's correct, Your Honor.
24              THE COURT:  Okay.  Okay.
25              And on the other side, I just have Mr. Akeel; is that
```

```
 1    correct?
 2              MR. AKEEL:  That's correct, Your Honor.
 3              THE COURT:  Okay.
 4              Now, Counsel, do you really want five minutes, or do
 5    you really want some other amount of time?
 6              MR. ARMAS:  No, I will be very brief.
 7              THE COURT:  That doesn't say you want five minutes.
 8              MR. ARMAS:  How about six?
 9              THE COURT:  Okay.
10              But now, don't repeat your prior argument because --
11              MR. FRIEDMAN:  I definitely --
12              THE COURT:  -- I have been listening, and I am taking
13    notes.
14              MR. FRIEDMAN:  I definitely will not do that.
15              THE COURT:  Okay.  Thank you.
16              MR. FRIEDMAN:  If I may, I just want to respond to
17    just a few particular points that were made by relators'
18    counsel.
19              THE COURT:  Okay.
20              MR. FRIEDMAN:  First of all, he was very clear at the
21    very end that this is not -- this is a reporting case, not a
22    payment case.
23              THE COURT:  Not a what?
24              MR. FRIEDMAN:  Payment case.
25              THE COURT:  Okay.
```

1          MR. FRIEDMAN:  And money is the only thing that the

2    False Claims Act deals with under (a)(1)(G).  And there is no

3    obligation that they have identified with any particularity

4    that has been avoided.

5          Next, I want to call the Court's attention to 42

6    U.S.C., 1395(y)(B)(8).  And the reason I'm calling your

7    attention to that statutory provision is because that's the

8    provision that outlines the reporting requirements, not what

9    realtors' counsel articulated them as, but what's in that

10   provision should the Court have any interest in that

11   provision.

12         Next, I want to respond to the arguments that

13   Takemoto and Hayes were not public disclosures.

14         I am looking at a section of the Takemoto complaint

15   titled, ***Congress Changes MSP Rules in 2007***, and there are

16   pages and pages of discussion of Section 111.

17         Then, I'm looking at Count Nine, which involved my

18   client.  I was actually there for Takemoto.  I argued the case

19   in the Second Circuit.  And there were absolutely allegations

20   of Section 111 reporting.  That's in Count Nine beginning at

21   paragraph 170.

22         I was heartened to hear, again, the distinction

23   between reporting and payment that realtors' counsel thought

24   so important.  Paragraph 379 of the Hayes complaint was the

25   one he focused on.  There are two sentences in that paragraph.

1    One talks about Section 111 reporting, and two talks about

2    repaying medical expenditures.

3           And relators say this complaint, the one that is here

4    today, is only about Section 111 reporting.  Well, if it's

5    only been Section 111 reporting and not about medical

6    expenditures, again, we have no obligation that is at issue in

7    this case.

8           Now, there indisputably has been a public disclosure.

9    I think the 20 pages or so analysis in just -- Judge Murphy's

10   decision makes that crystal clear.  What I was expecting to

11   hear from the relators is some discussion about how the

12   allegations that they have made materially add to those public

13   disclosures.  And I didn't hear anything.  The closest I heard

14   was pointing to that bar chart that is up on the easel in

15   front of the Court at the moment.

16          That bar chart doesn't say anything.  And, in fact,

17   when I listened to the description of what that bar chart was

18   in bumping up data, I heard data being compared that was in

19   car accident reports to data that private health insurance

20   companies have, to data that was bought from ISO.  What I did

21   not hear, and this is critical to this case, is that the

22   reports didn't make it to the Government.  I didn't hear that

23   the relators said to the Government, did you get this report.

24   No -- and they said no.  In fact, the transcript will say, the

25   closest I heard was, I bumped up the data to Ability, whoever

1    that is.  And Ability didn't match some other data I have.

2         There was nothing that the relators said to

3    substantiate the idea that a single report didn't make it to

4    the Government, bar chart or no bar chart.

5         And, in fact, there was no efforts to reconcile the

6    ten exemplars that are appendix B to the complaint, each of

7    which was supposedly reported to the Government.  There is a

8    coherence here, missing to this complaint.

9         There was a lot of discussion about lots of prior

10   lawsuits and all the good work that relators think MSP

11   Recovery has done.  And I'm not going to get into that.

12        All I will say is, every other lawsuit they have

13   filed, just like this one, is about recovering money for

14   private health insurers.  It is not about money that went to

15   the Government.  Not a single one of those lawsuits dealt with

16   Rule 9(b).  And not a single one of those lawsuits supported

17   the theory that was here.

18        I was in the ACE case.  My client get -- got out

19   because these allegations were no good.

20        The last thing I want to say is with respect to the

21   absence of an exemplar here, is the reference to Prather.

22   Prather definitely is a Sixth Circuit case that allowed a

23   relator a little more leeway than identifying a specific false

24   claim.

25        Owsley, O-w-s-l-e-y, the case I discussed at length

```
 1    in my main argument, read Prather and assimilated the Sixth

 2    Circuit Law on the subject.  And I summarized that for you

 3    earlier today.  I won't do it again.

 4         Suffice it to say, that the failure to plead one

 5    specific example, one, is fatal to the case.

 6         When I have argued hundreds -- dozens and dozens of

 7    12(b)(6) motions where you say this fails to state a claim,

 8    the other side gets up, they go through your example, and they

 9    explain, I'm going to show the jury this, I'm going to show

10    the jury that, and I'm going to show the jury the other thing.

11    And with those three things, that establishes the elements of

12    my cause of action.  That's missing from the case.  You didn't

13    hear it during Plaintiff's argument.  It's nowhere in the

14    complaint.

15         Again, the defendants respectfully appreciate the

16    Court's time.  And thank you for the attention that we know

17    you're going to give to the important matter.  And I think

18    that the Court should dismiss the case with prejudice because

19    there's no basis for any amendment that's been suggested.

20         And, thank you, Your Honor.

21         THE COURT:  Okay.  Thank you.

22         MR. ARMAS:  Judge, may I have a -- a small rebuttal?

23         THE COURT:  No.

24         MR. ARMAS:  Okay.

25         THE COURT:  That seems really unfair, but --
```

```
 1              MR. ARMAS:  Judge, I promise you --
 2              THE COURT:  What is --
 3              MR. ARMAS:  -- that somehow --
 4              THE COURT:  -- the rebuttal?
 5              MR. ARMAS:  -- coming from you, it doesn't seem
 6    unfair at all.
 7              THE COURT:  Okay.  What were you going to rebut?
 8              Are you going to rebut that the offer of exemplars,
 9    or are you going to rebut, like -- tell me, have you offered
10    an amended complaint that you filed, a further amended
11    complaint, and so I can determine why, if you amended it, it
12    would not be futile or something like that?
13              MR. ARMAS:  No, Judge.  No.  But we have not
14    proffered an amended complaint.
15              THE COURT:  Don't you think you're required to do
16    that?
17              MR. ARMAS:  I don't believe so, Judge.
18              THE COURT:  Okay.
19              MR. ARMAS:  And, Judge, if I could.
20              When a defendant --
21              THE COURT:  State your name again so the --
22              MR. ARMAS:  Yes, Judge.  It's Alfredo Armas.
23              THE COURT:  Even though I said no, you still came to
24    the podium.
25              Five minutes, okay?  No further because you all are
```

 1   exhausting your arguments.

 2           MR. ARMAS:  Judge, if I could, I want to address the

 3   point raised by the Court because that's the most important to

 4   me.

 5           It cannot be the law that every time a defendant

 6   files a motion to dismiss, a Plaintiff must strike its tent

 7   and withdraw its complaint and proffer an amended complaint.

 8           I -- I believe, and I submit to the Court that we

 9   have identified a massive fraud with specificity.  But if the

10   Court is not satisfied that, yes, we should be given the right

11   to file a second amended complaint.  Reminding the Court that

12   this is the first pleading that has been disputed by -- by

13   these insurance defendants.

14           THE COURT:  Okay.

15           MR. ARMAS:  Thank you.

16           THE COURT:  Thank you, Counsel.

17           All right.  Let's hear the other arguments.

18           This is for the State Farm defendants, right?

19           MR. BARUCH:  That's right, Your Honor.

20           THE COURT:  Okay.

21           MR. BARUCH:  And I'll try to be brief.  I know this

22   --

23           THE COURT:  You're not required to be brief.

24           MR. BARUCH:  Okay.  I appreciate that.

25           THE COURT:  You're required to approach the amount of

1     time you've indicated that you would need, okay?

2          MR. BARUCH:  Which I thought was brief, but that's

3     okay.

4          So I'm going to address -- I'm Doug Baruch on behalf

5     of the State Farm defendants, and I'm going to address a

6     couple of points that are specific to State Farm.

7          I want to talk about --

8          THE COURT:  Okay.  Hold on one second.

9          MR. BARUCH:  -- our efforts to get Mr. Angelo to

10    comply with Judge Cleland's order in a separate RICO case.

11    Our position is that Mr. Angelo has not complied with that

12    order.  And as a result, we don't know yet, whether the

13    Government will consent to the dismissal of State Farm from

14    this qui tam action.

15         And second, I want to spend a minute on State Farm's

16    first-to-file argument.

17         THE COURT:  State Farm's what?

18         MR. BARUCH:  We had a -- we have a separate

19    first-to-file argument.

20         THE COURT:  Sure.  Okay.

21         MR. BARUCH:  So even if the action isn't dismissed

22    pursuant to the RICO settlement, we, State Farm, believe that

23    the state -- the False Claims Act under the first-to-file bar

24    under 3730(b)(5) blocks the second relator, MSP WB, from

25    pursuing any claims against State Farm.

```
1              And these -- these State Farm grounds are in addition
2    to the arguments that apply to all -- all of the defendants,
3    as Mr. Friedman explained.  And so, if the Court dismisses the
4    action on the public disclosure bar, or any of the other
5    reasons applicable to all defendants, then the Court would not
6    need to resolve the additional arguments raised by State Farm.
7              THE COURT:  Okay.  Thank you.  Go ahead.
8              MR. BARUCH:  Okay.
9              Now, I also want to make a very quick point about the
10   conspiracy count that's been addressed here this afternoon.  I
11   want to emphasize that State Farm has an additional argument
12   with respect to that claim.
13             With respect to the State Farm, the claim is not
14   adequately pled, the conspiracy claim, because the claim rests
15   on the allegation that the insurer defendants worked with
16   Defendant ISO.  And that's even more obvious given relator
17   MSP's most recent submission, which, again, makes the supposed
18   dealings with ISO the center of their case.
19             And you heard it from Mr. Armas today, he said that
20   they all use ISO, that ISO is at the very center of the
21   conspiracy here.  But the situation's different for State
22   Farm.  State Farm did not contract with ISO.
23             As we pointed out in our brief, State Farm had its
24   own system for reporting to Medicare, and it did not enter
25   into an outside contract for those services.  We made those
```

1    points in our filings at ECF 338, page ID 2017, and ECF 341,

2    page ID 2869.

3            Relators did not dispute State Farm's representations

4    in this regard.  So while State Farm joins in the motion of

5    all of the defendants here to dismiss the conspiracy count,

6    the conspiracy claim as to the State Farm's defendants fails

7    on this additional core defect, unchallenged fact that State

8    Farm did not contract with ISO.

9            So let me start by talking about the -- the

10   enforcement of the RICO settlement agreement between State

11   Farm and Mr. Angelo.

12           So a little bit of background first.  State Farm and

13   the original relator here, Mr. Angelo, were in litigation

14   before Mr. Angelo filed his qui tam action.  State Farm had

15   filed a RICO action against Mr. Angelo and his companies.  And

16   that RICO case is in this District Court before Judge Cleland.

17           So before -- before the qui tam case was unsealed,

18   State Farm and Mr. Angelo settled that RICO case.  And one of

19   Mr. Angelo's many obligations under the RICO settlement was

20   that he had to talk all actions necessary to discontinue any

21   other litigation he had against State Farm.  And when State

22   Farm later found out about this qui tam action, which had been

23   under seal at the time, State Farm moved to enforce the

24   settlement agreement and have Mr. Angelo take the steps

25   necessary to dismiss this qui tam action.  And State Farm

```
 1   filed that action, that motion in front of Judge Cleland
 2   because he retained jurisdiction under the settlement
 3   agreement.  And Mr. -- and Judge Cleland granted that motion
 4   to enforce.  He granted it twice.  And he held that the qui
 5   tam action, this qui tam action against State Farm, fell
 6   within the scope of the agreement, the settlement agreement,
 7   for purposes of Mr. Angelo's dismissal obligations.  And he
 8   ordered Mr. Angelo to take steps to discontinue the actions,
 9   including by seeking the Government's consent to dismissal,
10   and to take no contrary or inconsistent acts.
11         State Farm's position is that Mr. Angelo has not
12   complied with that order.  He's not properly sought the
13   Government's consent for Mr. Angelo to voluntarily dismiss the
14   qui tam action as to State Farm.  And we don't know, because
15   of that, whether the Government will consent.  And because of
16   this noncompliance, we filed yet another motion, a second
17   motion to enforce before Judge Cleland.  And that motion is
18   pending.
19         But our ask here is simple.  We want Mr. Angelo to
20   file a notice of voluntary dismissal as to State Farm in this
21   case.  And once he makes that filing, the Government will
22   either consent in writing to the dismissal, or it won't.
23         So the Government hasn't had to make that election
24   yet because Mr. Angelo has never asked it to do that.
25         THE COURT:  What's the nature of the -- is the
```

1    current nature of the suit before Judge Cleland a motion to

2    enforce it, or some other thing, like a motion for contempt or

3    something?

4           MR. BARUCH:  We -- we filed a second motion to

5    enforce.

6           THE COURT:  Okay.  Okay.

7           MR. BARUCH:  We have not filed a motion for contempt.

8           THE COURT:  All right.  Go ahead.

9           MR. BARUCH:  Okay.

10          THE COURT:  Anything else on that?

11          MR. BARUCH:  Okay.

12          And then, I do want to just spend a minute on the

13   first-to-file argument.  And we briefed -- we briefed that bar

14   and how it applies, and how it should prevent the MSP

15   relators' attempt to insert itself, and to Mr. Angelo's

16   pending qui tam.

17          But let me just take a minute because there's been an

18   intervening decision by Judge Murphy, and he made an

19   assessment of the first-to-file argument made in the Allstate

20   case that came out after the briefing in this -- on the motion

21   to dismiss here, was disclosed.

22          And so, respectfully, we think Judge Murphy in that

23   limited instance, his interpretation of Section 3730(b)(5) was

24   wrong.  Judge Murphy said that he was relying on the plain

25   text of the statute by reading the word "intervention" in

1    3730(b)(5), as referring only to a Rule 24 intervention, and

2    not a relator edition by Rule 15 amendment.

3           But if we actually look at the use of the word

4    "intervene" in the False Claims Act statute, we find that it's

5    used -- it's used several times, three times in the statute.

6    And in all -- in all instances when it's used, it's referring

7    to the Government's intervention and decidedly, not a Rule 24

8    intervention.

9           Government intervention under the False Claims Act is

10    unique.  It's not -- they're not subject to the criteria of

11    Rule 24.

12           And the point is, that within the False Claims Act,

13    we believe, and it shows clearly that Congress did not equate

14    intervention, I want to use that term in the False Claims Act,

15    with a Rule 24 intervention.

16           In addition, the Sixth Circuit hasn't addressed this

17    specific exact situation here, but it has been very clear, and

18    it's in the Walburn case that's been discussed this afternoon.

19    The Sixth Circuit has made clear that the first-to-file bar

20    unambiguously prevents successive plaintiffs from bringing

21    related actions.

22           So it's clear that if -- if MSP WB, the new relator

23    here, had filed a separate qui tam action, it would clearly be

24    barred.  So here, MSP is still a successive relator in this

25    context, is trying to come into this suit after Mr. Angelo

1    already filed suit, and allowing it to intervene here through

2    an amendment, would just be really circumventing or an end run

3    around the unambiguous statutory bar.

4           And finally, on this point, when Mr. Angelo filed the

5    amended complaint against State Farm in June of 2021, we

6    believe that he was violating his obligation under the RICO

7    settlement agreement.  As we talked about a couple of times

8    already, Judge Cleland already has held that the RICO

9    settlement agreement -- excuse me, required Mr. Angelo to take

10   all actions necessary to dismiss the qui tam action.  And he

11   said that Mr. Angelo could undertake no contrary or

12   inconsistent acts until he complied with that obligation.  And

13   as a result, he was not permitted to -- to file the amended

14   complaint which introduced MSP WB into this action.

15          If the Court has no further questions, or no

16   questions, I will submit.

17          THE COURT:  Okay.  Thank you, very much.

18          I don't have any questions at the time.

19          MR. BARUCH:  Okay.  Thank you.

20          MR. AKEEL:  Good afternoon, Your Honor.  Shereef

21   Akeel on behalf of the relators.

22          THE COURT:  Good afternoon.  You may proceed.

23          MR. AKEEL:  Thank you.  Thank you, Judge.

24          Your Honor, I'm responding with respect to the

25   private litigation that involved relator Michael Angelo, with

1    State Farm, in a separate no-fault RICO action regarding

2    payment, wrongful payment of no-fault benefits involving car

3    accidents.

4          In -- in that matter, the RICO complaint was filed by

5    State Farm March 6, 2019.  No government claims were involved.

6    No -- no issues involving Medicare or Medicaid.  It was purely

7    involving breach of a contract or a wrongful payment based on

8    policies involving insurance.

9          On July 24, 2019, the qui tam complaint -- the qui

10   tam matter was filed under seal after Mr. Michael Angelo

11   discovered fraud being perpetrated by State Farm against the

12   United States.

13         On March 2, 2021, while the matter was still being --

14   was still under seal, the RICO matter was settled.  State Farm

15   was not aware, or could they be aware of any government

16   claims.  The relator would violate or breach the seal if he

17   discloses the fraud that was reported to the United States.

18         April 6, 2021, this matter was unsealed.  State Farm

19   became aware of the govern -- the claim -- the fraudulent

20   claims against the Government, and they tried to -- well, they

21   filed a motion claiming that the settlement agreement that

22   they entered into includes government claims, Medicare claims.

23   We objected.

24         We cited also, Bedrock Law, Sixth Circuit Law, that a

25   relator is prohibited from entering into any agreement to

1    release a qui tam action when -- after it's been filed.

2          So a release cannot be entered into to release

3    government claims while the matter is pending, without the

4    consent of the Government.

5          We cited the law, U.S. Health Possibilities, 207 F.3d

6    335.

7          There was also other arguments why the matter was not

8    within the scope of this private settlement agreement.  That

9    matter is pending before the Sixth Circuit.  We filed the

10   Notice of Appeal.  Nevertheless, Judge Cleland provided

11   Michael Angelo a deadline.  By May 16, 2022 -- well, let me

12   back track.

13         First, Judge Cleland agreed that Mr. Angelo cannot

14   dismiss -- agreed with Mr. Michael Angelo, that the Government

15   claims cannot be dismissed as how State Farm was seeking it

16   originally.  Judge Cleland said specifically, I'm providing a

17   deadline for Mr. Michael Angelo by May 16, 2022, to simply ask

18   the Government.  That was ECF 149, 22822 order, ECF 149, page

19   15.

20         On May -- this is now a subsequent development after

21   the briefs have been filed here.  On May 16, I contacted the

22   Government to advise them of Judge Cleland's order to seek

23   consent to dismiss.  The Government responded by stating, one,

24   Angelo has no authority to release the Government claims; and

25   two, Government maintains the same position in allowing for

 1    the prosecution of the qui tam claims against State Farm.

 2           I filed a declaration in the Cleland matter, ECF 162,

 3    8327.  I also memorialized the conversation and attached an

 4    e-mail with the Government, ECF 165-4, page ID 8401.

 5           A month later, on June 16 -- a month later on June 16

 6    -- so we thought that was the end of the story, that's it.  We

 7    had an issue that -- of the interpretation of the settlement

 8    agreement.  I contacted the Government saying, hey, there is

 9    -- State Farm is still -- here's this order, this is what

10    we're being asked to do.  Thought that was it after we filed

11    the declaration.

12           A month later, State Farm filed a new motion.  It's

13    an untimely motion, June 16, 2022.  Now, they are seeking for

14    Mr. Michael Angelo to file a motion for voluntary dismissal,

15    which is different than what the judge asked Mr. Michael

16    Angelo to do, which was to simply ask.

17           Here, they're asking for a motion to be filed, which

18    is, again, contrary to Sixth Circuit Law that the Government

19    claims are not enforceable within the context of a release

20    that's entered by a relator if -- while a qui tam action is

21    pending.

22           That matter is pending, and it's really -- it's

23    disguised as a motion to enforce, but it's really a motion to

24    try to amend the order to try.  And that matter is pending

25    right now.

1          Also, what is being lost here, is we have a

2     co-relator, MSP.  MSP has not been haled into court with Judge

3     Cleland, has not been involved, at all, in this private RICO

4     matter.  It's totally separate.  It has its own rights.  This

5     matter involving Mr. Angelo is a persona matter involving his

6     individual claims.

7          So we have a co-relator.  We have due process rights

8     here.  Because the co-relator, MSP is also -- as its acting as

9     an agent for the Government here, and is not bound by any

10    State Farm, and does not -- by any State Farm agreement, and

11    does not wish, of course, to dismiss, but to continue

12    prosecuting the claims against the Government.

13         THE COURT:  Okay.  Mr. Akeel, adjust your mask a

14    little bit.

15         MR. AKEEL:  Sorry.  It's, like, choking me.

16         THE COURT:  Okay.  I understand.  But adjust it to

17    keep it up, okay?

18         MR. AKEEL:  Okay.  I will.  I'm trying to breathe

19    through it.

20         Your Honor, regarding the first-to-file bar argument,

21    we rely on the brief that we pled in, and also, the

22    established law that an amendment is proper through Rule 15.

23         A co-relator can enter into an agreement with a

24    relator if they have a private agreement.  This is not a

25    parasitic lawsuit.  This is not a new lawsuit.  It's

1    contemplated.  There's case law, a plethora of case law that

2    supports that.  Judge Murphy also has ruled that the first-to

3    bar is not violated.  That's ECF 102, 2954.

4            Oh, one -- one other argument, Your Honor, regarding

5    the particular fraud.

6            Brother Counsel indicates that State Farm has a

7    unique situation here, that they do not use ISO.  Actually,

8    they do.  Actually, they admitted that they do.  That's at

9    3351968.

10           Importantly, contrary to what I've heard today where

11   they're trying to kind of downplay the significance of ISO

12   like it's a BroadSpire or Fugit, ISO is essentially the

13   central hub.  It's a Clearinghouse, we've pled that, for the

14   entire insurance industry.  It has over 660 million claims.

15   It has a history of every single claim that's filed in the

16   United States.

17           So if someone with Progressive in 1990 files a claim,

18   then he's with Auto Club in 2020, they'll be able to track

19   him.  That's a very vital source for the insurance companies

20   to determine the history of a -- of a claimant.  And ISO has

21   been delegated with a responsibility to file, to be the

22   mouthpiece to the Government, and file proper reports.

23           Likewise, the roles here are reversed.  State Farm

24   uses ISO data to file whatever they need to file.  Because the

25   roles have shifted here, where ISO is not the one that's

1    filing the direct report for the insurance company, I mean,

2    like they do for the rest of the insurance company.

3           State Farm uses ISO data, and ISO does not have the

4    required data, including the social security numbers, which is

5    a very simple thing to ask of insureds.  So Medicare is able

6    to match the social security number of a Medicare recipient

7    with the social security number with a claimant.  Once that's

8    a match, then it triggers the Government's ability to send a

9    notice to the primary payer saying, hey, give us back the

10   money because there's that lack of information, simple things

11   as a social security number.

12          And that goes to that definition that Counsel had

13   indicated about the fraud.  It's the -- under the

14   fraudulent -- under the U.S.C., 3721(a)(9)(G), knowingly is

15   defined to include a person who has actual knowledge of the

16   information, acts in deliberate ignorance of the truth or

17   falsity of the information, who acts in reckless disregard of

18   the truth or falsity of the information.  And, requires no

19   proof of specific intent to defraud.

20          You heard the Prather, reckless disregards language,

21   provides liability to defendant -- to a defendant who buries

22   their head in the sand.  That's Prather, 892.

23          Burying their head in the sand, not asking for the

24   social security number when a claim is filed.  They ask for

25   everything else except the social security number.  Then, they

```
 1    file the Section 111 report, doesn't include the social

 2    security number, CMS does not have it, it can't match, does

 3    not know about the accident, cannot seek reimbursement.

 4              There was some -- again, the downplay regarding ISO.

 5    ISO, because of its role, and because MSP had discovered this

 6    massive fraud and kicked out MSP as indicated before, ISO has

 7    never been implicated.  There was no prior news article.  No

 8    prior lawsuit involving ISO.  This is the first time that ISO

 9    has been implicated and accused for the massive fraud here.

10              And this was all given and furnished to the

11    Government before this -- the matter was unsealed.  We also

12    filed a notice.  We filed a notice.  It's part of the record,

13    of the information that we had furnished to the Government.

14    And I'll get you the cite.

15              Yeah, 379 is the notice of supplement that we filed

16    with the record.  I know this case went from one judge to

17    another, and I understand so some things could get lost, but

18    379 demonstrates the -- it includes in my declaration, what

19    was furnished to the Government before this matter was

20    unsealed.  It includes a memo.  And a memo demonstrates how

21    all the data was tied together to demonstrate to the

22    Government, this massive fraud that occurred.

23              And this, again, Your Honor, goes to first of all, we

24    cleared the public disclosure.  ISO was never disclosed.

25    We're done with that.  But if there is an argument that there
```

```
 1    is a public disclosure, which there shouldn't be because
 2    there's nothing -- you can't say anything about ISO, the
 3    original source kicks in.
 4              Did we materially add to publicly available with the
 5    significant role by ISO in being the mouthpiece for the entire
 6    insurance industry in filing these regular quarterly CMS
 7    reports?  The answer is yes.
 8              For those reasons, Your Honor, we ask that the
 9    dismissal would be denied.
10              Thank you.
11              THE COURT:  Okay.  Thank you.
12              Do you have rebuttal?
13              MR. BARUCH:  Yes, Your Honor.  I need 30 seconds.
14              THE COURT:  No lawyer ever speaks for 30 seconds.
15              MR. BARUCH:  I'm going to do it.
16              So very, very briefly just on the very first point.
17    Our position is, relator did not properly seek the
18    Government's consent.  The proper way to seek the Government's
19    consent is to file a motion for voluntary dismissal.  The
20    statute provides that the Government -- that the Attorney
21    General has to consent in writing.
22              Why are we guessing at what the Government's position
23    is here?  It's very simple.  They should file a motion.  The
24    Government will either consent in writing or withhold its
25    consent in writing.  Then, we'll know.
```

 1          Thank you.

 2          THE COURT:  Okay.  Anything else from anyone else?

 3  No?  Okay.  Then, thank you for your arguments, and I will

 4  give you a written order.

 5          We will put ourselves on notice to see if Judge

 6  Cleland enters any further order.  But if you become aware of

 7  it and it does not seem like we've noticed, please notify us

 8  that an order has been filed, all right?

 9          MR. BARUCH:  Yes, Your Honor.

10          THE COURT:  Okay.  Thank you for your arguments.  And

11  I'll give you a written order, like I said.

12          And, court is in recess, and have a good evening.

13          CASE MANAGER:  All rise.

14          THE COURT:  One question, this chart is at the end of

15  the complaint, or at the end of your --

16          MR. SUSMAN:  It's at the end of the complaint.

17          THE COURT:  Okay.  I'm aware of that.  So it's in

18  that section?

19          MR. SUSMAN:  Yes.

20          THE COURT:  Okay.  All right.  Thank you, very much.

21  So court is in recess.

22      (The proceeding was concluded at 4:44 p.m.)

23                          *     *     *

24

25

```
 1                      *      *      *

 2                  C E R T I F I C A T E

 3      I certify that the foregoing is a correct transcription of

 4   the record of proceedings in the above-entitled matter.

 5

 6   S/ Shacara V. Mapp                           12/16/2022

 7   Shacara V. Mapp,                             Date

 8   CSR-9305, RMR, FCRR, CRR

 9   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```